*Boedicker v. Rushmore Loan Management Servicers LLC,* Case No. 2:16-cv-02798-JTM

Defendant Rushmore Loan Management Services LLC's Motion for Summary Judgment

# Exhibit 10

ANTHONY YOUNGER                                  September 27, 2017

                                                              Page 1

1               IN THE UNITED STATES DISTRICT COURT
                       DISTRICT OF KANSAS
2                   AT KANSAS CITY, KANSAS

3    DOUGLAS AND SERENITY              )
     BOEDICKER,                        )
4                                      )
                    Plaintiffs,        )
5    VS.                               ) Case No.
                                       ) 2:16-cv-02798-JTM-TJJ
6                                      )
     RUSHMORE LOAN MANAGEMENT          )
7    SERVICES LLC,                     )
                                       )
8                   Defendant.         )

9

10          ------------------------------------
                       ORAL DEPOSITION OF
11             RUSHMORE LOAN SERVICES LLC
                  CORPORATE REPRESENTATIVE
12                    ANTHONY YOUNGER
                    SEPTEMBER 27, 2017
13          ------------------------------------

14

15

16          ORAL DEPOSITION OF ANTHONY YOUNGER, produced as a

17   witness at the instance of the Plaintiffs, and duly

18   sworn, was taken in the above-styled and numbered cause

19   on September 27, 2017, from 9:02 a.m. to 10:40 a.m.,

20   before Christy Cortopassi, CSR in and for the State of

21   Texas, reported by machine shorthand, at the offices of

22   U.S. Legal Support, 5910 N. Central Expressway, Suite

23   100, Dallas, Texas 75206, pursuant to the Federal Rules

24   of Civil Procedure and the provisions stated on the

25   record or attached hereto.

ANTHONY YOUNGER                                         September 27, 2017

Page 2

```
 1                A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4      MR. BRIAN D. FLICK
        The Dann Law Firm
 5      810 Sycamore Street
        Third Floor
 6      Cincinnati, Ohio 45202
        513.645.3488
 7      bflick@dannlaw.com
 8
     FOR THE DEFENDANT RUSHMORE LOAN MANAGEMENT SERVICES LLC:
 9
        MR. DAVID L. BOMAN
10      South Law
        13160 Foster
11      Suite 100
        Overland Park, Kansas 66213
12      913.663.7735
        david.boman@southlaw.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                     INDEX
                                            PAGE
 2   Appearances........................... 2
 3   ANTHONY YOUNGER
 4      EXAMINATION BY MR FLICK............. 4
 5
     Changes and Signature................. 84
 6   Reporter's Certification.............. 86
 7                   EXHIBITS
 8   NO.      DESCRIPTION                 PAGE
 9   Exhibit 1   Request for Admission, Interrogatories
                 & Request for Production.... 13
10   Exhibit 2   September 1, 2016 letter..... 16
     Exhibit 3   Trial Modification Agreement.. 26
11   Exhibit 4   September 30, 2016 letter.... 43
     Exhibit 5   November 1, 2016 letter...... 48
12   Exhibit 6   January 11, 2016 letter...... 66
     Exhibit 7   Equifax report............... 72
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1               P R O C E E D I N G S
 2                ANTHONY YOUNGER,
 3   having been first duly sworn, testified as follows:
 4               EXAMINATION
 5   BY MR FLICK:
 6      Q.  Good morning.
 7      A.  Good morning.
 8      Q.  How are you?
 9      A.  Doing good.
10      Q.  We met at another deposition, did we not?
11      A.  Yes, we did.
12      Q.  Cincinnati?
13      A.  That's correct.
14      Q.  Well, obviously, I take it you remember my name
15   is Brian Flick.  I'm with the Dann Law Firm.
16      A.  Okay.
17      Q.  I'm here on behalf of the plaintiffs Douglas
18   and Serenity Boedicker.  And I forget, what's your name?
19      A.  Anthony Younger.
20      Q.  That's right.  Thank you.  Anthony, I -- do you
21   mind if I call you Anthony, or Mr. Younger, whatever --
22   what do you prefer?
23      A.  Anthony is fine.
24      Q.  Well, Anthony, I know you heard my boss' spiel
25   during that deposition.  So certainly I know that you
```

Page 5

```
 1   have been deposed before.  If I ask you something you
 2   don't understand, please tell me to repeat it.  I have a
 3   tendency to talk a little fast, I can slow down if
 4   needed.  If you need to take a break, let me know.
 5      A.  Okay.
 6      Q.  Okay?
 7      A.  All right.
 8      Q.  Where are you located, where is your office?
 9      A.  In Dallas, Texas.
10      Q.  Okay.  Where specifically?
11      A.  It's 1700 Wittington Place, Dallas, Texas.
12      Q.  All right.  And you, obviously, are here as the
13   corporate representative of Rushmore?
14      A.  Correct.
15      Q.  Correct?  You work for Rushmore?
16      A.  Yes.
17      Q.  What's your current title?
18      A.  Legal proceedings representative slash field
19   asset specialist.
20      Q.  And how long have you had that title?
21      A.  Since I started with Rushmore.
22      Q.  How long have -- how long have you worked for
23   Rushmore?
24      A.  For three years and nine months.
25      Q.  Has your position with Rushmore always been the
```

ANTHONY YOUNGER                                        September 27, 2017

Page 6

1  same?
2      A.  Yes.
3      Q.  Okay.  Prior to working at Rushmore, where else
4  did you work?
5      A.  I worked for Bank of America, NA.
6      Q.  How long were you at Bank of America?
7      A.  For two and a half years.
8      Q.  What was your title?
9      A.  MRT specialist.
10     Q.  And what did you do, what -- what does an MRT
11 specialist do?
12     A.  They handle litigated foreclosure files.  We
13 prepare documents for trials, depositions, mediations,
14 approve fees, and work the file from the time it was
15 litigated until judgment.
16     Q.  Was the litigation work at Bank of America, was
17 it nationwide or particular to a state?
18     A.  It was nationwide.
19     Q.  Nationwide.  With your capacity at Rushmore in
20 your current job, do you handle both foreclosure and
21 litigation files?
22     A.  At my current job at Rushmore, I -- every file
23 that I'm associated with is litigated --
24     Q.  Okay.
25     A.  -- in some form or fashion.

Page 7

1      Q.  Some -- nationwide or a particular region?
2      A.  Nationwide.
3      Q.  Okay.  How many times have you been deposed
4  before?
5      A.  Over 50.
6      Q.  Okay.  Within the last year, how many times
7  have you been deposed?
8      A.  About 35 or 40 times, probably.
9      Q.  Have they always been in the course of
10 litigation?
11     A.  Yes.
12     Q.  How many times have you testified on behalf of
13 Rushmore, as a corporate representative?
14     A.  This year or any --
15     Q.  Let's go this year.
16     A.  So for probably 130 times.
17     Q.  Okay.  Again, they have all been contested
18 litigation files that you have done that testimony?
19     A.  Yes.
20     Q.  Have they been both in -- in state and federal
21 court?
22     A.  The majority have been in state court.
23     Q.  Okay.  Any particular state, just out of
24 curiosity?
25     A.  No.  We -- we handled -- we -- we have files

Page 8

1  all over the place, so.
2      Q.  Sure.
3      A.  So not a particular state.
4      Q.  Did you get a chance to review the notice of
5  deposition?
6      A.  Yes, I did.
7      Q.  Before today.  Before we go any further...
8          MR. FLICK:  David, is there any -- any
9  objection -- any objection to anything that was on the
10 revised notice that we have been gone back and forth,
11 anything that you want to put on the record?
12         MR. BOMAN:  That's going to depend on the
13 questions you ask.
14         MR. FLICK:  Okay.
15         MR. BOMAN:  Concerning the topics.
16         MR. FLICK:  Oh, I understand.  Other than
17 that, anything other than just at the offset?
18         MR. BOMAN:  Not -- no.  I'll reserve that.
19         MR. FLICK:  Okay.
20         MR. BOMAN:  And then I'll wait and see what
21 your questions are.
22         MR. FLICK:  Okay.
23         MR. BOMAN:  Anything -- obviously, if you
24 were to just ask him one of these questions --
25         MR. FLICK:  Certainly.

Page 9

1          MR. BOMAN:  -- and say please answer it,
2  I -- I might have an objection to that.
3          MR. FLICK:  Yeah.  I -- I -- I understand
4  completely.
5          MR. BOMAN:  But we'll see how you break
6  them down.
7          MR. FLICK:  Sure.  Absolutely.
8      Q.  (BY MR. FLICK)  So you understand you are here
9  today as a corporate representative of Rushmore,
10 correct?
11     A.  Yes.
12     Q.  And you are prepared to testify as to all of
13 Rushmore's policies and procedures, as to the topics
14 that were in the deposition?
15     A.  Yes.
16     Q.  Okay.  Have you reviewed any documents to
17 prepare yourself today?
18     A.  I did.
19     Q.  What did you look over?
20     A.  I reviewed the complaint, I reviewed the
21 interrogatories, answers to the interrogatories, I
22 reviewed the exhibits, the letters from
23 Rushmore, the notices of error from your office, I
24 reviewed Rushmore's records.
25          There were a lot of documents that I did

ANTHONY YOUNGER                                    September 27, 2017

---

**Page 10**

1  review.  If I missed any.
2      Q.  Sure.  What else, if anything, besides the
3  documents that you just recited that you did to prepare,
4  other than talk to your lawyer?
5      A.  Like I said, I reviewed Rushmore's records
6  which included documents in our system.
7      Q.  Okay.  Okay.  And the records you looked at,
8  were they all electronic within Rushmore?
9      A.  Yes.
10     Q.  Okay.  And Rushmore's servicing platform is
11  called what?
12     A.  MSP.
13     Q.  MSP.  And during your entire time at Rushmore,
14  that's all they had used, correct, as a servicing
15  platform?
16     A.  That is correct.
17     Q.  Okay.  Are there any other intra-office
18  software programs, aside from MSP, that you looked at?
19     A.  I also reviewed our document, DNA program, or
20  document DNA system.  That's where we keep all our copy
21  of documents in the system.
22     Q.  When you say documents, what are you referring
23  to?
24     A.  Copies of the documents that I have seen.
25     Q.  Okay.

---

**Page 11**

1      A.  That I have reviewed.
2      Q.  So in addition to MSP, Rushmore has a separate
3  internal intra-office, this DNA program?
4      A.  Document --
5      Q.  Document, you said document?
6      A.  I said document.
7      Q.  Yeah.
8      A.  Like storage.
9      Q.  Sure.  It's document storage?
10     A.  Correct.
11     Q.  Okay.  Other than those two systems, is there
12  any other system that you reviewed?
13     A.  No.
14     Q.  Or -- I'm sorry.  When I say system, I assume
15  you understand I mean any other software or a platform,
16  servicing platform?
17     A.  Yes, I -- that's correct.
18     Q.  Okay.  Obviously, you have looked over the
19  complaint.  Did you have a chance to review the decision
20  on the memorandum, to understand why we're here and the
21  limited scope of the two issues that we may be here for?
22     A.  I am aware of that, yes.
23     Q.  Okay.  Are you familiar with the Real Estate
24  Settlement Procedures Act?
25     A.  I'm sorry?

---

**Page 12**

1      Q.  Are you familiar with the Real Estate
2  Settlement Procedures Act?
3      A.  If you are referring to RESPA, yes.
4      Q.  Yes.  You -- you know what RESPA is?
5      A.  Yes.
6      Q.  What's Rushmore's current notice of error,
7  request for information address?
8      A.  It is our Laguna, it's -- it's our California
9  address.
10     Q.  Okay.
11     A.  It is like -- I have lost the --
12     Q.  Okay.
13     A.  I can't remember exactly what it is.  It's
14  Laguna Drive in Irvine, California.  I don't -- I can't
15  remember the actual number.
16     Q.  Okay.
17     A.  But that's where -- that's where it's at.
18     Q.  Do you know how long Rushmore has maintained
19  that address as the current address?
20     A.  Since I have been employed at Rushmore.
21     Q.  Okay.  And you said you have been there three
22  and a half years?
23     A.  Three years, nine months.
24     Q.  Three years, nine months.  I apologize.
25     A.  Yes.

---

**Page 13**

1      Q.  All right.  You had stated you had reviewed the
2  interrogatories and Rushmore's responses, correct?
3      A.  Yes.
4      Q.  Okay.
5          MR. FLICK:  His is going to be No. 1.  May
6  I -- I think I'll give you a stapled copy.
7          (Exhibit No. 1 was marked.)
8          MR. FLICK:  Thank you.  This is for you.
9          MR. BOMAN:  This is No. 1?
10         MR. FLICK:  This will be No. 1, yes.
11     Q.  (BY MR. FLICK)  This is for you.  I have handed
12  you what we have just marked as Exhibit 1.  Have you
13  seen this document before?  Go ahead and take your time
14  to review it.  I apologize.
15         Now that you have had a chance to review
16  it, have you seen this document before?
17     A.  Yes.
18     Q.  Okay.  Can you identity this document?
19     A.  Yes.  This is Plaintiff's First Request For
20  Admissions.
21     Q.  Okay.  Would it be fair to say these are
22  Rushmore's Responses to those Requests for Admissions,
23  Interrogatories and Request of Production of Documents?
24     A.  Yes.
25     Q.  Okay.  And you, yourself, took no part in

---

ANTHONY YOUNGER                                      September 27, 2017

Page 14

1   preparing these responses, correct, personally?
2       A.  No.
3       Q.  Okay.  If you could turn to page two of this
4   document, the first set.  Under numbered paragraph
5   three.  It states, admit the mortgage loan in the
6   instant matter is a federally-related mortgage loan.
7           Do you see where that says -- do you see
8   that paragraph?  I know a read a little there.
9       A.  Yes.
10      Q.  What was Rushmore's response to that question?
11      A.  It's denied.
12      Q.  Do you -- what's the basis that Rushmore denied
13  that request for admission?
14      A.  I don't -- I'm not -- I don't know.
15      Q.  Okay.  You had stated earlier you are familiar
16  with RESPA, correct?
17      A.  Yes.
18      Q.  Based on your familiarity with RESPA, based on
19  your familiarity with the documents that you reviewed in
20  this case, is there anything that you reviewed, based on
21  your knowledge and Rushmore's knowledge, that would lead
22  you to believe to support that denial, that this is not
23  a federally-related mortgage loan?
24      A.  I'm sorry.  Can you -- I --
25      Q.  I'm sorry.  I'll rephrase.

Page 15

1       A.  Can you re -- will you rephrase that for me,
2   please?
3       Q.  Based on your knowledge of RESPA, on behalf of
4   Rushmore, is there any fact in anything that you
5   reviewed that supports that denial?
6       A.  In my review?
7       Q.  Yes.
8       A.  Not that I recall.
9       Q.  Thank you.  We're going -- we're going to
10  actually go to the next paragraph here, number four.
11          You had stated before, you have familiarity
12  with RESPA.  Are you aware of the small servicers
13  exception?  Have you reviewed that part of RESPA before,
14  either personally or on behalf of Rushmore?
15      A.  I have reviewed the -- I have reviewed the
16  RESPA --
17      Q.  Okay.
18      A.  -- decision, but I'm -- as far as the small
19  service exception, I mean, I -- I reviewed it but that
20  is not something I committed to memory, so that.
21      Q.  Okay.  At any time during in -- during your
22  time with Rushmore, three years and nine months, has
23  Rushmore serviced more or less than 5,000 mortgage loans
24  at any given time?
25          Let -- let me put it to you another way.

Page 16

1       A.  Okay.
2       Q.  During your time at Rushmore, based on
3   everything you know and everything you reviewed on
4   behalf of Rushmore, has Rushmore serviced less than
5   five -- less than 5,000 mortgage loans during that
6   period of time?
7       A.  I believe we have had more than 5,000.
8       Q.  Okay.  Based on your knowledge of Rushmore, is
9   Rushmore a Municipal Housing Finance Agency?
10      A.  A VA --
11      Q.  Municipal Housing Finance Agency?
12      A.  No.
13      Q.  Okay.  Rushmore was not created by some act of
14  the government and by government, I mean a federal,
15  state or municipal legislature, correct?
16      A.  Not that I'm aware of.
17      Q.  Okay.  Thank you.
18          MR. FLICK:  We're going to label this No.
19  2.
20          (Exhibit No. 2 was marked.)
21          MR. FLICK:  This will be No. 2.  That is
22  for you.
23      Q.  (BY MR. FLICK)  Take a minute to look over that
24  document.
25      A.  Okay.

Page 17

1       Q.  Can you identity this document?
2       A.  Yes.  This is a -- is a denial letter from --
3   written by Rushmore.
4       Q.  Okay.  What's the date on the document?
5       A.  September 1, 2016.
6       Q.  Okay.  Do you know, based on your review, who
7   prepared this document, specifically at Rushmore?
8       A.  No.
9       Q.  Okay.  Well, I will -- if you could, turn to --
10  hang on, what would be the fourth page of the document?
11      A.  Okay.
12      Q.  You see where it states, sincerely --
13      A.  Uh-huh.
14      Q.  I'm sorry.  It -- my copy may be a little
15  disjointed here -- sincerely, Home Retention Department.
16  Do you see that part?
17      A.  Yes.
18      Q.  Is it fair to state that someone in the home
19  retention department would have prepared this document?
20      A.  Yes.
21      Q.  At the time that this document was generated,
22  how many employees were in the home retention
23  department?
24      A.  I do not know.
25      Q.  As the corporate representative of Rushmore,

ANTHONY YOUNGER                                    September 27, 2017

Page 18

1  you do not know how many people were working in the home
2  retention department as of September 1, 2016?
3      A. Rushmore is a large company, that's a large
4  department.
5      Q. Okay.
6      A. I don't know how many people were working in
7  that department.
8      Q. When you say large department, I mean, is there
9  a ballpark how many employees there may have been at
10 that time?
11     A. Well, I wouldn't want to -- I wouldn't want to
12 estimate without --
13     Q. Okay.
14     A. -- because I would like to give you facts.
15     Q. Okay. Do you -- how many supervisors would
16 there be within that department?
17     A. That would be --
18     Q. At that time?
19     A. I'm not sure. I'm not sure how many
20 supervisors are there. Like I stated earlier --
21     Q. Okay.
22     A. -- I don't -- I want to give you facts so I
23 wouldn't want to guess.
24     Q. And I appreciate that. When this document is
25 prepared, how many people would review this document

Page 19

1  within Rushmore, before it is sent out?
2      A. How many people would review it? The -- the
3  preparer would, after the information was given --
4      Q. Sure.
5      A. -- it would be prepared. And then it would be
6  reviewed by a supervisor before it being sent out.
7      Q. So it's fair to say at least two people would
8  have looked at this document before it was sent out by
9  Rushmore?
10     A. Yes.
11     Q. Okay. The person who prepared this document,
12 are they the same person who would have done the review
13 of the underlying loss mitigation packet?
14     A. No.
15     Q. Okay. Specifically as to the loss mitigation
16 packet that would have been generated, the September 1,
17 2016 letter, on behalf of Rushmore, do you know how many
18 employees would have reviewed the loss mitigation packet
19 the Boedicker's submitted that led to this denial?
20     A. The -- it would have been -- the process would
21 have gone -- once the information would have been
22 received, there would have been a person that reviewed
23 it and inputted it.
24            And then a person, the next step would be
25 for them to start to verify the information. And then a

Page 20

1  third person would have reviewed it and made the
2  decision as to the outcome.
3      Q. Okay. So it's fair to say at least three
4  people would have done that?
5      A. Yes.
6      Q. Okay. Would all three of those people have the
7  same supervisor, in reviewing this?
8      A. I don't believe so.
9      Q. Okay. I assume -- well, I'm sorry. Strike
10 that.
11            Does Rushmore have policies and procedures
12 to prepare these kind of letters?
13     A. Yes.
14     Q. How are they kept?
15     A. Our policies and procedures?
16     Q. Yes.
17     A. In our system.
18     Q. Which system? You had -- let me clarify.
19            You had stated earlier that when you had
20 reviewed all these documents, there was the DNA system,
21 the MSP system?
22     A. Our documents in the DNA system, correct.
23     Q. Where would the policy and procedure manual be,
24 what system?
25     A. It's our RushNet, an internal --

Page 21

1      Q. Okay.
2      A. -- system that we keep.
3      Q. Okay. Is RushNet part of DNA or is DNA part of
4  RushNet?
5      A. Neither.
6      Q. Neither?
7      A. They are separate systems that --
8      Q. Okay. So RushNet is a third system?
9      A. Yes.
10     Q. Okay. Is it fair to say that RushNet is
11 completely internal?
12     A. Yes.
13     Q. Okay. Is that where all policies and procedure
14 manuals would be kept?
15     A. Yes.
16     Q. Is it completely electronic?
17     A. Yes.
18     Q. Are there any written policies and procedure
19 manuals for a loss mitigation and by written, I mean
20 anything that is like a book, paper, that are given to
21 employees or employees have access to?
22     A. No.
23     Q. Okay. Who prepared -- do you know who prepared
24 the procedure manual that would have been used, that
25 would have governed how these letters are generated?

ANTHONY YOUNGER                                    September 27, 2017

Page 22

1      A.  We have a department, our training and
2   compliance department, along with the managers or the
3   heads of the different departments.
4      Q.  Okay.
5      A.  They generate the procedures and policies
6   according to the laws.
7      Q.  How often are they updated?
8      A.  Whenever there is a new policy change.
9      Q.  Okay.
10     A.  There is not a timeframe.
11     Q.  Okay.  Let me ask you this.  Since the
12  beginning of this year, has that policy and procedure
13  manual been updated?
14     A.  Yes.
15     Q.  How would employees be notified of the updates?
16     A.  Once there is an update to a policy and
17  procedures, we receive an e-mail for notification and
18  training as to the new policy.
19     Q.  How is training done?
20     A.  For updates to policies and procedures?
21     Q.  Yes.
22     A.  The training is -- once there's an update,
23  it -- like I stated, there is an alert to the update.
24  The employee goes in and they have to review and be
25  familiar with the new policies and procedures.  There is

Page 23

1   an acknowledge and --
2      Q.  Okay.  Is this all done electronically?
3      A.  Yes.
4      Q.  Is there any sort of video training,
5   demonstrative training?
6      A.  For updates in policies and procedures?
7      Q.  Yes.
8      A.  It depends, once again, on how big the policy
9   change is.
10     Q.  Okay.  Based on your knowledge of Rushmore's
11  procedures as September 1, 2016, is this letter in front
12  of you a standard letter for Rushmore, as far as saying
13  this is a HAMP denial, is this a standard form letter
14  that Rushmore would generate if there is a HAMP denial?
15     A.  Yes.
16     Q.  Having reviewed this letter, why were the
17  plaintiffs denied a loan modification?
18     A.  Per the letter, their debt-to-income ratio was
19  higher than the threshold or the waterfall for the -- a
20  HAMP modification, or a modification in this.
21     Q.  If the Boedickers, or anyone applied for a
22  modification now, I understand HAMP is now gone, and
23  they were denied, would they get a similar letter to
24  this?
25         MR. BOMAN:  Objection; hypothetical, but...

Page 24

1      A.  It would be pretty much similar as to the
2   description or what the information they would be given.
3      Q.  (BY MR. FLICK)  Okay.  Well, turning to the
4   DTI, based on your knowledge.
5         The policy and procedures as of
6   September 1, 2016, is this a correct statement that that
7   was the acceptable DTI range of 25 to 42 percent for a
8   HAMP modification as of September 1, 2016?
9      A.  Could you rephrase that?  I'm sorry.  I --
10     Q.  I'm sorry.  That was a compound question.
11         THE REPORTER:  And maybe slow down.
12     Q.  I --
13         MR. FLICK:  Thank you.
14     Q.  (BY MR. FLICK)  Based on your knowledge, in the
15  policies and procedures, in paragraph 11, the denial
16  of the DTI, was that -- is that a correct statement of the
17  review done by Rushmore?
18     A.  Yes.
19     Q.  Okay.  Do you know what the DTI was calculated
20  at?
21     A.  From my review of that, I believe it was over
22  the 42 percent threshold.
23     Q.  Okay.  Do any third party -- I'm sorry.
24     A.  Okay.
25     Q.  Do any third party -- outside of -- and do any

Page 25

1   third parties, outside of Rushmore, participate in any
2   of the review of loss mitigation, for this particular
3   application?  Would any -- would any third parties have
4   participated, outside of Rushmore?
5      A.  No.
6      Q.  Okay.  When this letter is mailed, is it mailed
7   directly by Rushmore?
8      A.  Yes.
9      Q.  Rushmore, at that time, employed no third-party
10  vendors to prepare or send letters?
11     A.  No.
12     Q.  Okay.  If you can turn to the very last page of
13  this exhibit, this would be page seven.
14     A.  Uh-huh.
15     Q.  It is marked.  Do you see that?
16     A.  Are you referring to this page?
17     Q.  Yeah.  That last page.  There should be seven
18  pages.  You have reviewed -- have you seen this letter
19  before?
20     A.  Yes.
21     Q.  Can you identity this letter?
22     A.  This is a letter that was in -- sent to the --
23  to the borrower for them to sign and return a trial
24  modification agreement.  Along with the -- that two
25  agreements that's stated in the letter.

ANTHONY YOUNGER                                    September 27, 2017

Page 26

1     Q.  Okay.  Would this letter -- I -- I noticed that
2  this letter doesn't have a -- where it was sent from, on
3  the bottom.  It just says from Rushmore.
4          Would this have been sent by the home
5  retention department, as well?
6     A.  Well, yes.
7     Q.  Okay.  Were there any -- are there any other
8  departments that were involved in the review of loss
9  mitigation for the Boedickers?
10    A.  Outside of our --
11    Q.  As to this particular --
12    A.  No.
13    Q.  -- modification packet.  Okay.  Thank you.
14          MR. FLICK:  All right.  We're going to mark
15  this as Exhibit 3.
16          (Exhibit No. 3 was marked.)
17    Q.  (BY MR. FLICK)  This will be 3.  Give you an
18  opportunity to review that.
19          Have you had an opportunity to review this
20  document?
21    A.  Yes.
22    Q.  Can you identify this document?
23    A.  This is a trial modification agreement.
24    Q.  What's the date?
25    A.  September 1, 2016.

Page 27

1     Q.  Now going back to Exhibit 2, page seven of
2  Exhibit 2.
3     A.  This --
4     Q.  That letter that referenced the trial
5  modification agreement?
6     A.  Yes.
7     Q.  Is Exhibit 3 the trial modification agreement
8  that is on page seven of Exhibit 2?
9     A.  Yes.
10    Q.  Okay.  Now are we in agreement that, pursuant
11  to this trial modification agreement, the Boedickers
12  would have been required to pay $2,950 by September 15,
13  2016?
14    A.  Restate that question for me, please.
15    Q.  Early in the agreement, let's go to page two of
16  this document, paragraph three.  Do you see where that
17  says trial modification agreement?
18    A.  Yes.
19    Q.  Are we in agreement that the terms of the trial
20  modification agreement would be parts A, B, C and D of
21  this agreement, as far as what the Boedickers were
22  required to pay to Rushmore for the trial modification?
23    A.  Yes.
24    Q.  Okay.  Having reviewed the entire file, are we
25  in agreement that the Boedickers did not make those

Page 28

1  payments?
2     A.  That is correct.
3     Q.  Okay.  Who would have prepared this trial
4  modification agreement?
5     A.  This would have been prepared by the loss
6  mitigation department.
7     Q.  Okay.
8          THE REPORTER:  I didn't hear you.
9          THE WITNESS:  Loss mitigation department.
10    Q.  (BY MR. FLICK)  When you say loss mitigation
11  department or -- is that the same as the home retention
12  department?
13    A.  Yes, it is.
14    Q.  Okay.  At that time, was it the same -- was the
15  same department --
16    A.  Yes.
17    Q.  And presently, is it still the same?
18    A.  Yes.
19    Q.  Okay.  Thank you.  Now you had testified or you
20  had stated earlier, it was fair to say that at least
21  three people had participated in the review of the
22  trial -- of the application for modification.
23          Would one of those three people have
24  generated this doc -- this document?
25    A.  Yes.

Page 29

1     Q.  Okay.  Do you know which one, specifically?
2     A.  It wouldn't have been the person inputting
3  information.  It would have been the person, the
4  third -- second person who actually reviews the
5  information to send it for modification approval.  They
6  would review the figures that were given to us by the
7  borrower.
8     Q.  Okay.
9     A.  And that information would have been generated
10  from here, while the other inform -- the information
11  been verified in order to either deny or offer a mod --
12    Q.  Okay.  And on behalf of Rushmore, you can't
13  identify that person today?
14    A.  No.
15    Q.  Is there anything that you could review that
16  you could provide me the name of that person, not
17  necessarily today, but in general?
18    A.  To -- that -- that generated the letter or this
19  document?
20    Q.  Yes.
21    A.  I don't believe -- not that I -- not that I can
22  think of.  There is not a -- let me see how to say that.
23  There is not anything in the document, itself, that I
24  could look to review to see who generated it or...
25    Q.  Okay.  Would this document have been generated

ANTHONY YOUNGER                                September 27, 2017

Page 30

1   through MSP?
2       A.  The notation of it would have been generated
3   through MSP, yeah.
4       Q.  Okay.  This trial modification agreement, I
5   assume it comes from an underlying form, is that a fair
6   statement?
7       A.  Yes.
8       Q.  Okay.  Is that form maintained on MSP or
9   RushNet?
10      A.  Well, no forms or anything are retained on
11  RushNet.
12      Q.  Okay.  So --
13      A.  But the form would be in a -- in MSP, the
14  information that you put in --
15      Q.  Sure.
16      A.  -- to generate the numbers, would be inputted
17  in MSP.
18      Q.  Okay.
19      A.  And then a -- a document would be -- the
20  modification document would then be sent to be printed
21  and mailed.
22      Q.  Does every employee at Rushmore have a unique
23  user ID or log into MSP?
24      A.  Yes.
25      Q.  Is there a way within MSP that Rushmore can

Page 31

1   identity who would have prepared this document, based on
2   a log-in or ID?
3       A.  Like I said earlier, the document, itself, the
4   information would have been put and requested for it to
5   be printed.
6       Q.  Okay.
7       A.  And then there would be a notation that this
8   document was printed and then it was sent out but --
9       Q.  Okay.
10      A.  -- that notation would be -- as the document is
11  printed --
12      Q.  Sure.
13      A.  -- the system would notate what's going on from
14  there.
15      Q.  Okay.  But the input and the output would be
16  done by an employee of Rushmore, correct?
17      A.  Yes.
18      Q.  And there is a way, within MSP, to identity
19  that, correct?
20      A.  I believe so, yes.
21      Q.  Okay.
22      A.  Because --
23      Q.  As we talked about, under paragraph three of
24  Exhibit 3, the first payment the Boedickers were to pay
25  Rushmore was 2,950, correct?

Page 32

1       A.  Yes.
2       Q.  How did Rushmore arrive at that figure?
3       A.  For -- there -- it's a determination on the
4   amount that's due.  It's a certain percentage, depending
5   on the -- the file of who -- who we service the file
6   for.  And it's considered a down payment.  So that's
7   where that amount would have come from.
8       Q.  Okay.  At the time of this trial modification
9   agreement and -- strike that question.
10                  We'll start here.  When you stated just now
11  that you service -- Rushmore services the loan on behalf
12  of another party, correct?
13      A.  Yes.  Uh-huh.
14      Q.  That other party, is it fair to say would be
15  the investor or the owner?
16      A.  Yes.
17      Q.  At the time this agreement was created, who was
18  the owner?
19      A.  Wilmington Trust.
20      Q.  Okay.  To the best of your knowledge,
21  Wilmington Trust is still the owner of the loan,
22  correct?
23      A.  Yes.
24      Q.  Okay.  And during all times during the
25  service -- Rushmore service, that Wilmington has been

Page 33

1   the owner, correct?
2       A.  Yes.
3       Q.  Of this particular loan?
4       A.  Yes.
5       Q.  Now you stated just now that a -- the 2,950
6   comes from a percentage.  Who decides that figure?
7       A.  Well, that figure is a -- we have guidelines --
8       Q.  Sure.
9       A.  -- that we follow for every investor.  And
10  that's --
11      Q.  Sure.
12      A.  -- Wilmington's guidelines or their percentages
13  whatever the...
14      Q.  Sure.  Now Wilmington's guideline, how would a
15  person in the home retention department know what those
16  guidelines are?
17      A.  Well, we -- they -- they know because
18  Wilmington's gives them -- gave them when you service --
19  start servicing loans --
20      Q.  Sure.
21      A.  -- for Wilmington, we are given the specs or
22  guidelines --
23      Q.  Sure.
24      A.  -- as to how that happens.  So every employee
25  that works for the portfolio that Wilmington services,

ANTHONY YOUNGER                                    September 27, 2017

Page 34

1  they have those guidelines.
2      Q.  Okay.  And those guidelines, are they kept
3  electronically?
4      A.  Yes.
5      Q.  Okay.  They're inputted into the MSP system, I
6  assume?
7      A.  The guidelines?
8      Q.  Yes.
9      A.  No.
10     Q.  All right.
11     A.  The guidelines would be along the lines that
12 our policies are kept also.  So that would be an
13 inter --
14     Q.  Sure.
15     A.  -- Rushmore information.
16     Q.  Okay.  So Wilmington's guidelines, have you had
17 the opportunity to review those guidelines before today?
18     A.  I have reviewed -- I have seen the --
19     Q.  Okay.
20     A.  -- the investor guidelines before.
21     Q.  Okay.
22     A.  For all of our investors.
23     Q.  Is it fair to say that those investor
24 guidelines are within a pooling and servicing agreement?
25     A.  The guidelines, I'm assume -- aren't in the

Page 35

1  actual pooling --
2      Q.  Okay.
3      A.  -- and servicing agreement because Rushmore is
4  the service agreement.
5      Q.  Sure.
6      A.  But the -- the guidelines we were made aware of
7  at the time that we start servicing the loan for them,
8  so.
9      Q.  Okay.  At any time, much like we were talking
10 about with updates, if Wilmington changes their
11 guidelines, is -- does Rushmore notify its employees in
12 the home retention department?
13     A.  Yes.
14     Q.  In a similar matter than what we talked about
15 with the training before, there would be an e-mail that
16 goes out?
17     A.  Right.  Because it is part of our policies and
18 procedures.
19     Q.  Sure.  And the training that's -- and the -- a
20 brief training or acknowledgment, that you understand
21 it, these guidelines have changed?
22     A.  Correct.
23     Q.  Okay.  Having reviewed Wilmington's guidelines
24 for this loan, is there any policy to request an
25 exception?

Page 36

1      A.  Well, in all the guidelines there are room for
2  exceptions.
3      Q.  Sure.
4      A.  So we wouldn't consult Wilmington as far as
5  any, you know, they -- they wouldn't be consulted on
6  a -- because we're servicing the loan, so.
7      Q.  Okay.  To the best of your knowledge, having
8  reviewed Rushmore's records, was a sort of exception
9  reviewed for this loan before this trial modification
10 agreement was offered?
11     A.  Per my review of our records, they explored all
12 options --
13     Q.  Okay.
14     A.  -- before the loan -- during this trial
15 modification agreement.
16     Q.  Okay.  Does this particular trial modification
17 have some sort of name or title within Rushmore?
18     A.  I'm sorry?
19     Q.  I -- I -- some servicers -- I'll explain --
20 I'll extrapolate a little bit more.
21         Some servicers, for example, you know, with
22 HAMP gone, they'll offer different modification
23 programs?
24         Internally, they may title it HAMP, right,
25 Tier Two, Proprietary One, Proprietary 15.  Does

Page 37

1  Rushmore maintain any sort of list or nomenclature?
2      A.  Well, like I stated earlier, we have -- those
3  are part of --
4      Q.  Sure.
5      A.  -- the guidelines that are given and those
6  exceptions.  I mean, that's what --
7      Q.  Sure.
8      A.  -- that's -- in -- that's encompasses the
9  exception --
10     Q.  Sure.
11     A.  -- in exceptions that the servicers give us.
12     Q.  Sure.  Okay.  Your knowledge of Wilmington's
13 guidelines, how many different modification options were
14 there for this loan?
15     A.  Like I stated earlier, I reviewed all of the
16 guidelines for the services that we -- we service for.
17     Q.  Yeah.
18     A.  I -- I didn't memorize them.  I wouldn't be
19 able to tell you --
20     Q.  Okay.
21     A.  -- exactly how the -- or what their guidelines
22 for and every option they would be able to give but we
23 do have that --
24     Q.  Okay.
25     A.  -- available.

ANTHONY YOUNGER                                    September 27, 2017

Page 38

1      Q.  As this data is inputted into MSP, is there a
2  way within MSP or any other software that the home
3  retention people have, to know how many different
4  programs that a loan would be reviewed for, for
5  modification, or this loan?  I apologize.
6      A.  Would you do that -- or will you repeat that
7  please or rephrase it.
8      Q.  I'll -- I'll let you know where I'm going with
9  this.
10     A.  Okay.
11     Q.  Obviously, this modification was prepared by
12 Rushmore.  It is a nonstandard modification and this is
13 not a HAMP modification, correct?
14     A.  Correct.
15     Q.  Because they were denied?
16     A.  Correct.
17     Q.  Was this modification the only modification
18 option available for this loan?
19     A.  Like I said earlier, per my review, this trial
20 modification that was given to the borrowers, every
21 avenue was explored --
22     Q.  Okay.
23     A.  -- before sending out this -- this
24 modification.
25     Q.  Okay.  And to the best of your knowledge,

Page 39

1  having reviewed all of the documents, the signed copy of
2  this trial modification, there was never a signed copy
3  tendered back to Rushmore, correct, on behalf of the
4  Boedickers, they never signed and returned this,
5  correct?
6      A.  No.  Well --
7      Q.  Did you want to add to your answer?
8      A.  No, I don't want to add.  I was thinking to
9  myself.
10     Q.  Okay.  That's fine.  At the time this trial
11 modification would have been done, would Rushmore have
12 known what the permanent modification terms were?
13     A.  No.
14     Q.  Okay.  Would those have come directly from
15 Wilmington?
16     A.  No.  Rushmore is the servicer.  We would have
17 been the ones to initially review the permanent
18 modification.
19     Q.  Okay.  But who comes up with the terms for the
20 permanent modification?
21     A.  Rushmore.
22     Q.  But Rushmore didn't know what they would be
23 when this trial was offered?
24     A.  It is part of the modification process.  So
25 theses guide -- the ability to perform in the trial

Page 40

1  mod --
2      Q.  Okay.
3      A.  -- while verifying the information that was
4  given us -- given to us for the initial modification
5  itself, would have been done and still working on the
6  best possible modification.
7          But this is part of that modification
8  process.  So this would have had to be completed first
9  before we would have had terms.
10     Q.  Okay.  Let's go to page one of this document.
11 In the middle of the body, you see that there is a
12 notation, a total plan arrearages of 14,450.09.  Do you
13 see that?
14     A.  Yes.
15     Q.  Is it fair to say -- well, I'm not going to --
16 sorry.  Strike that.
17          The paragraph under that.  Directly under
18 that, borrow -- that begins with borrower's nondefault
19 regular mortgage payments.
20     A.  Okay.
21     Q.  You read that paragraph?
22     A.  Yes.
23     Q.  Based on your understanding of the trial
24 modification and everything you have reviewed, what
25 would have happened to those payments had the Boedickers

Page 41

1  complied with the trial modification?
2      A.  Well, those payments would have been applied to
3  their account that --
4      Q.  Okay.  Did Rushmore anticipate the Boedickers
5  making those payments in addition to the trial
6  modification payments?
7      A.  I'm sorry?
8      Q.  Did Rushmore anticipate those three payments,
9  because we'll agree the amount says that there's three
10 payments due October 1st through December 1st, totalling
11 3,168.39, which is three contractual monthly mortgage
12 payments?  Are we in agreement with that?
13     A.  Well, the -- those three payments they're
14 referring to are the trial modi -- the trial mod
15 payments that they would be making.
16          The $1,160 -- 1,160 payments that they
17 referred to --
18     Q.  Okay.
19     A.  -- on the second page --
20     Q.  Okay.
21     A.  -- those would be -- those aren't -- they are
22 not three regular payments, those are the trial
23 modification --
24     Q.  Yeah.
25     A.  -- payment -- agreement payments.

ANTHONY YOUNGER                                    September 27, 2017

Page 42

1      Q.  But would you agree with me, if I read this
2  paragraph, the explicit language of this paragraph,
3  Rushmore's referring to the contractual monthly payments
4  that are due during those three months?
5      A.  No.  These are -- these are the -- these are
6  the -- once again, this is the -- the three payments
7  they're referring to are the trial modification
8  agreement payments.
9      Q.  Correct.  Would we agree, during those three
10 months though, there were contractual payments due, on
11 the loan, that were not being paid?
12     A.  That there were contractual payments?
13     Q.  Yeah.
14     A.  I'm a little confused here.
15     Q.  Okay.
16     A.  So are you talking in reference to the trial
17 mod payments or their regular payments and valid dates?
18     Q.  Regular mortgage payments, per their mortgage.
19     A.  Well, they're in a trial modification.
20     Q.  Okay.
21     A.  If they were to -- had accepted the trial
22 modification for their payments being made, the
23 contractual payments, which would be get -- would --
24 they would be just making the regular modification
25 payments, because where -- they're in the trial mod.

Page 43

1      Q.  Okay.  Okay.  At the time -- or at that time
2  this modification was offered, do you know how many
3  loans Rushmore was servicing on behalf of Wilmington?
4      A.  I do not.
5      Q.  Can you provide a ballpark?
6      A.  I wouldn't want to -- I mean, I want to give
7  you facts.  I don't --
8      Q.  Okay.
9      A.  I wouldn't be able to estimate the amount.
10     Q.  Do you know, on behalf of Rushmore, how many
11 trial modification agreements would have been offered on
12 behalf of Wilmington during that time -- during this
13 time?
14     A.  No, I wouldn't.
15     Q.  Okay.
16     A.  The same answer as earlier.
17     Q.  Okay.  Thank you.
18          MR. FLICK:  I'm going to mark this as 4.
19          (Exhibit No. 4 was marked.)
20          MR. FLICK:  One for you.
21     Q.  (BY MR. FLICK)  I'm going to give you this.
22 This is 4.  I'll give your an opportunity to look at
23 that.
24     A.  Okay.
25     Q.  Okay.  Can you identity this document?

Page 44

1      A.  This is a loan modification request, notice of
2  action taken.
3      Q.  Okay.  What's the date?
4      A.  September 30th of 2016.
5      Q.  Okay.  And again, having reviewed this document
6  and having reviewed MSP, can you identity who prepared
7  this document?
8      A.  This document was prepared by our home
9  retention --
10     Q.  Okay.
11     A.  -- department.
12     Q.  And again, you can't state specifically who,
13 correct?
14     A.  Correct.
15     Q.  A quick side question.  On the top right
16 there is what appears to be a sequence of numbers and
17 letters.  Do you see that, very top right?
18     A.  Yes.
19     Q.  I'll point to it with my pen.
20     A.  Right.
21     Q.  What are those?
22     A.  Well, the first ten digits are the loan number.
23     Q.  Okay.
24     A.  And the other digits look like the letter ID.
25     Q.  Okay.  And is that the letter ID within MSP or

Page 45

1  some sort of internal notation?
2      A.  It's just a -- a letter ID.  I don't -- I don't
3  know if there's a -- it's not an internal notation.
4  It's just a -- the letter would be -- it's labeled the
5  loss mit, it's loss mit 320.  So that's --
6      Q.  Okay.
7      A.  -- just for -- for that letter.
8      Q.  Is this a standard letter to be sent out when
9  someone is denied a loan modification?
10     A.  At -- in September of 2016 --
11     Q.  Yes.
12     A.  -- or now?
13     Q.  As of that time, as of September 2016.
14     A.  Yes.
15     Q.  Now?
16     A.  It's almost -- I'm sure it's -- it's pretty
17 much the same.
18     Q.  Pretty much the same?
19     A.  Yeah.
20     Q.  Okay.  Now on the very bottom of paragraph
21 one -- or page one.
22     A.  Uh-huh.
23     Q.  You will see that there is a box under home
24 retention package, with two Xs?
25     A.  Okay.

ANTHONY YOUNGER                                    September 27, 2017

Page 46

1    Q.  Are we in agreement that the only reason the
2    plaintiffs were denied a loan modification is because of
3    what's indicated there with those two Xs, failing to
4    return an executed agreement or paying the payments for
5    the trial mod?
6        A.  So those are the only two -- that's the only
7    box that's marked.
8        Q.  Correct.  Having reviewed the loan MSP, all the
9    documents that you said you had reviewed, is there any
10   other reason why the plaintiffs were denied a loan
11   modification?
12       A.  Well, they didn't return the --
13       Q.  Sure.
14       A.  -- the signed -- that -- so that's the first --
15       Q.  Sure.
16       A.  -- that's the --
17       Q.  Sure.
18       A.  -- the first major step.  I mean, if you are
19   going to review for a loan mod, if you are not going to
20   even return the trial modification documents signed, to
21   agree to that, then it's hard to --
22       Q.  Sure.
23       A.  -- proceed with a process of reviewing you for
24   a loan modification.
25       Q.  Okay.  But other than not returning the

Page 47

1    documents, not making the payments, there was no other
2    reason they were denied, for this modification?
3        A.  For the trial -- for the trial modification.
4        Q.  Right.  For the trial mod.
5        A.  Right.  They were -- yes.
6        Q.  Right.
7        A.  They didn't return or make the payments,
8    correct.
9        Q.  And then, of course, the HAMP denial was the
10   DTI ratio, as we have talked about earlier, correct?
11       A.  The -- earlier, yes.
12       Q.  Okay.  Did Rushmore ever generate a waterfall
13   analysis for this modification?
14       A.  Well, the modification would have been in the
15   process of review.
16       Q.  Okay.
17       A.  With their -- they would have been in the
18   process of reviewing for a permanent modification.
19       Q.  Yeah.  When the trial modification is
20   calculated, is there a waterfall analysis done?
21       A.  There is a brief analysis done.  But it's, like
22   I stated earlier, it's based on the information given
23   from the borrower.  So if the borrower tells us that
24   this is their income --
25       Q.  Sure.

Page 48

1        A.  -- and sends us that information, we do an
2    analysis of that information before there is an in-depth
3    analysis to modify the terms of the loan.
4        Q.  Is that analysis ever sent to the borrowers?
5        A.  For a trial modification?
6        Q.  Yes.
7        A.  All right.  But no.
8        Q.  Okay.
9            MR. FLICK:  All right.  I'm going to go to
10   No. 5.  This is No. 5.
11           THE REPORTER:  Uh-huh.
12           (Exhibit No. 5 was marked.)
13       Q.  (BY MR. FLICK)  For you.  Go ahead and take a
14   minute.
15       A.  Okay.
16       Q.  Okay.  Can you identity this document?
17       A.  Yeah.  This is a letter sent to the borrower's
18   attorney in reference to correspondence that was sent
19   to -- to Rushmore.
20       Q.  What's the date of this letter?
21       A.  November 1st.
22       Q.  Why did Rushmore prepare this letter?
23       A.  To answer the -- like I said earlier, the two
24   correspondence sent to them from the borrower's
25   attorney.

Page 49

1        Q.  Okay.  Who prepared this letter?
2        A.  This letter would have been done by our
3    compliance department or corres --
4        Q.  I think it is customer correspondence
5    department.  Is that --
6        A.  Oh, customer correspondence department in --
7    Yes.
8        Q.  At that -- as of November 1, 2016 -- well,
9    strike that.
10           Between September 14, 2016 to November 1,
11   2016, how many people were in the customer
12   correspondence department?
13       A.  I --
14       Q.  On behalf of Rushmore?
15       A.  On behalf of Rushmore, I wouldn't want to --
16       Q.  Okay.
17       A.  -- guess as to how many people without giving
18   you the facts.
19       Q.  Does -- does the customer correspondence
20   department review all requests for information, notices
21   of error?
22       A.  Rushmore's -- well, the compliance
23   department --
24       Q.  Sure.
25       A.  -- our customer correspondence department,

ANTHONY YOUNGER                                    September 27, 2017

Page 50

1  would review all those notices in the end.
2      Q.  Okay.
3      A.  So, yes.
4      Q.  Would they review just general correspondence,
5  as well, that's sent, that may look like a notice of
6  error, request for information?
7      A.  Any time that it's -- yes.
8      Q.  Okay.
9      A.  Yes.  Basically, yes.
10     Q.  So I send a letter to Rushmore on behalf of the
11 Boedickers, just saying I want a loan history.  It does
12 not state this is a request for information.  It does
13 not state I am even representing the borrowers.
14         Is that letter immediately forwarded to the
15 customer correspondence department?
16     A.  Well, if it's deemed a letter that was -- needs
17 a response, then yes.
18     Q.  Okay.  Who makes that determination?
19     A.  Well, when the letter is received by Rushmore.
20     Q.  Okay.
21     A.  It's opened, and read, and --
22     Q.  Okay.
23     A.  -- the person who would -- who received the
24 letter in that -- in the mail department would deem
25 that, if it's a -- if that letter needs to go to the

Page 51

1  correspondence department, they would be sent to them.
2      Q.  So the letter starts in the mail department.
3  Is that fair to say, when it's received by Rushmore?
4      A.  Yeah.  When it's mailed to Rushmore --
5      Q.  Okay.
6      A.  -- I believe that's where it has to start.
7      Q.  Okay.  Is everything electronically scanned in
8  or is everything scanned in?
9      A.  Yes.
10     Q.  Okay.  All -- all incoming mail is then
11 electronically stored?
12     A.  All mail -- well, we're not --
13     Q.  I -- I -- well, strike that.
14         A correspondence letter such as what we're
15 discussing?
16     A.  Yes.
17     Q.  That would be scanned in and electronically
18 stored?
19     A.  Yes.
20     Q.  Correct?
21     A.  Correct.
22     Q.  Okay.  How is the mail person -- is the mail
23 person trained to identity certain things in these
24 letters, to know where to forward it?
25     A.  Yes.

Page 52

1      Q.  How are they trained?
2      A.  They are trained on the policies and
3  procedures.
4      Q.  Okay.
5      A.  So we do have policies and procedures in
6  place --
7      Q.  Sure.
8      A.  -- for all of these types of things.  So
9  they're trained on the policies and procedures, just
10 like everyone -- every other Rushmore employee.
11     Q.  And much like we were talking about a little
12 bit earlier, about the loss mitigation, those policies
13 and procedures are kept electronically?
14     A.  Yes.
15     Q.  Okay.  And who prepares them --
16     A.  The same --
17     Q.  -- specific to the mail?  The same people?
18     A.  The same people that --
19     Q.  Okay.
20     A.  -- prepare our policies and procedures for
21 every other department.
22     Q.  And again, if they're updated, you're notified,
23 an employee would be notified, do some level of
24 training, whatever is called for?
25     A.  Yes.

Page 53

1      Q.  Okay.  So this letter that was prepared on
2  November 1st, it references, in the first paragraph,
3  Rushmore responding to two pieces of correspondence
4  dated September 14, 2016, correct?
5      A.  Correct.
6      Q.  In your review of all documents, and MSP, and
7  anything that you reviewed, did you have a chance to
8  look over those two letters?
9      A.  I did.
10     Q.  Okay.  What were they?
11     A.  Do you -- do you have a copy of them you want
12 me to --
13     Q.  I do not.
14     A.  No?  Okay.
15     Q.  I'm asking you on behalf of Rushmore?
16         MR. BOMAN:  I'm going to object to the
17 question.
18         MR. FLICK:  Okay.
19         MR. BOMAN:  The form of the question, "what
20 are they" is.
21     Q.  (BY MR. FLICK)  You reviewed them though?
22     A.  I did.
23     Q.  You are familiar with the contents of those
24 letters?
25     A.  I did see the two letters, yes.

ANTHONY YOUNGER                                    September 27, 2017

<table>
<tr><td colspan="2">

**Page 54**

1      Q.  Okay.  Do you know what address those letters
2   were sent to?
3      A.  I don't recall the address.  I don't --
4      Q.  Okay.
5      A.  -- if --
6      Q.  Okay.
7      A.  Like I said earlier, if you have them in front
8   of me, I would be able to --
9      Q.  Okay.  But you did review them?
10      A.  Yes.
11      Q.  All right.  Do you know if either of those
12   letters specifically stated they were notices of error?
13      A.  I do believe, yes, they did say notice of error
14   at the top.
15      Q.  Okay.  So having reviewed those letters, based
16   on everything that you reviewed, is there any factual
17   basis why Rushmore would state they were not notices of
18   error and I'm speaking to both of those letters from
19   September 14, 2016, sent from Callahan Law?
20      A.  Well, after I reviewed the two letters, they --
21   after reading them, to me, they appeared to be noted --
22   they appeared to be more letters as far as information
23   as opposed to errors.
24      Q.  Okay.
25      A.  They were --

</td></tr>
</table>

**Page 56**

1      A.  No.
2      Q.  -- we have gone from point A to point B?
3      A.  Correct.
4      Q.  They go to customer correspondence department.
5   What happens to those letters next?
6      A.  Well, they're reviewed.
7      Q.  Okay.
8      A.  And -- and with any correspondence of that
9   nature we have a time limit as to when they have to --
10   they have to be acknowledged.
11      Q.  Sure.
12      A.  And they have to be investigated and responded
13   to.
14      Q.  Sure.
15      A.  And at that point they would have been notated
16   that we received them, reviewed, acknowledged, and then
17   after the investigation had been completed, we would
18   send a response.
19      Q.  Okay.  Are we in agreement this November 1st
20   letter is the response to those two letters from
21   Rushmore?
22      A.  Yes.
23      Q.  Okay.
24         MR. BOMAN:  I would add a caveat here.
25         MR. FLICK:  Sure.

**Page 55**

1      Q.  But they were requesting something from
2   Rushmore.  I'm sorry.  I did not mean to cut you off.
3      A.  No problem.
4      Q.  But they were requesting something from
5   Rushmore?
6      A.  Correct.
7      Q.  Okay.  The person in the mail department, how
8   many -- that would have reviewed those September 14
9   letters when they came in, how many pieces of mail do
10   they review in a count -- in a day, on average?
11      A.  I wouldn't want to --
12      Q.  Okay.
13      A.  -- guess or estimate.  I'm not sure.
14      Q.  Do you have any estimate as to how much
15   incoming mail Rushmore gets on a given day?
16      A.  I want only to give you the facts.
17      Q.  Okay.
18      A.  So I wouldn't want to guess.
19      Q.  Okay.  So this letter, these two letters
20   specifically, they're reviewed by the mail department?
21      A.  Uh-huh.
22      Q.  They're then forwarded to the customer
23   correspondence department?
24      A.  They're forwarded, yes.
25      Q.  Okay.  No unbroken chain --

**Page 57**

1         MR. BOMAN:  There are multiple
2   attachments --
3         MR. FLICK:  Sure.
4         MR. BOMAN:  -- to this letter, so.
5         MR. FLICK:  This is -- this is just the
6   cover to that letter.
7      Q.  (BY MR. FLICK)  Are we in agreement to that?
8      A.  Yes.
9      Q.  Okay.
10         MR. BOMAN:  Can I --
11         MR. FLICK:  Yes.
12         MR. BOMAN:  There are multiple attachments.
13         MR. FLICK:  There are multiple -- we're in
14   agreement, there were multiple attachments in this.
15      Q.  (BY MR. FLICK)  But this is the cover letter,
16   fair to say?
17      A.  Yes.
18      Q.  This letter, when it was prepared, how many
19   different people at Rushmore would have taken part in
20   preparing this letter, doing the review, to those two
21   September 14th letters?
22      A.  In that department, the person who received the
23   letter would have, like I say, logged it in.
24      Q.  Okay.
25      A.  It would have been done by the -- the process

ANTHONY YOUNGER                                    September 27, 2017

Page 58

1   would have taken place and done by that one person who
2   received that information.
3            And before the letter would have been sent
4   out, it would have been reviewed by a supervisor --
5   their supervisor to make sure that the information that
6   they found in their investigations were complete and
7   then sent out to the --
8       Q.  Sure.
9       A.  -- requesting party.
10      Q.  Both the employee and the supervisor, how many
11  notices of error would they be reviewing in a day?
12      A.  I wouldn't want to guess or --
13      Q.  Sure.
14      A.  -- give you nonfacts.
15      Q.  Does Rushmore require a quota of responses a
16  day for their employees?
17      A.  We don't.
18      Q.  To those notices of error?
19      A.  We don't have a quota system of any -- at
20  Rushmore.
21      Q.  Okay.  No, I understand that.  I will testify
22  to you, other servicers do.
23      A.  Okay.
24      Q.  That's why I'm asking.
25      A.  Uh-huh.

Page 59

1       Q.  When these responses are done, are there notes
2   made within MSP as the investigation is going, for a
3   particular people?
4       A.  No.  When we received these notices, there are
5   notations are there, the account is coded that there was
6   a request, some type of request, and that the
7   investigation is ongoing.
8            Once this is complete and the information
9   is sent to -- back to the requester, notes are made as
10  to when it was sent and what the -- what the
11  investigation showed.
12      Q.  Okay.  The person reviewing, doing the review,
13  what would they be looking at, what would they have
14  access to, to look at --
15      A.  They have --
16      Q.  -- to prepare their response?
17      A.  They have access to Rushmore system, in order
18  to complete this investigation.
19      Q.  Okay.  Is there any part of Rushmore system
20  they would not have access to, that they may need to get
21  a supervisor's approval for?
22      A.  No.
23      Q.  Okay.  Is there any third party that
24  participates in review, outside of Rushmore?
25      A.  No.

Page 60

1       Q.  Again, much like I was asking with the letter
2   for the HAMP denial, is there any third party who mails
3   these documents on behalf of Rushmore?
4       A.  No.
5       Q.  Everything is done by Rushmore at that time?
6       A.  Correct.
7       Q.  Okay.  The top paragraph of page two, of
8   exhibit -- of this exhibit.  It states, please note
9   that, as consumers, your -- you clients -- and I assume
10  that's a typo meant to say your clients, have the right
11  to request the documents relied upon.  The last part of
12  that paragraph -- paragraph, we have enclosed these
13  documents.
14           We have discussed, this is the cover letter
15  Rushmore sent documentation to the Callahan Law Firm,
16  along with this and you have had an opportunity to look
17  at those attachments, correct?
18      A.  Correct.
19      Q.  Was there a waterfall analysis attached to
20  that, those documents?
21      A.  Do you have the attachments you would like me
22  to --
23      Q.  I do not.
24      A.  -- look at to -- to -- in order to tell you?
25      Q.  No.

Page 61

1       A.  That was a -- that's a good packet.  I reviewed
2   it.  I didn't -- I don't recall --
3       Q.  Okay.
4       A.  -- it being a waterfall --
5       Q.  If there was a request --
6       A.  -- attachment.
7       Q.  I'm sorry.  I did not mean to interrupt you.
8   If there is a request made in either one of those
9   correspondence that asked for the waterfall analysis, is
10  there any reason Rushmore would not have provided it?
11      A.  If the information was asked for --
12      Q.  Yes.
13      A.  -- if they -- we would have provided a summary
14  of the --
15      Q.  Okay.
16      A.  -- waterfall and how --
17      Q.  Sure.
18      A.  -- the loan fell in that waterfall.
19      Q.  Okay.  But you don't know if that was provided?
20      A.  Well, I know that there was a summary of the
21  waterfall information on a few letters that we sent.  So
22  that information, from our review, showed that it was
23  provided.
24      Q.  Okay.  Last -- appreciate this, so far.
25      A.  Uh-huh.

ANTHONY YOUNGER                                    September 27, 2017

Page 62

1    Q.  The last paragraph, first sentence.  Client
2  still interested in loan modification and will need to
3  reapply.
4              At this point, as we have discussed as we
5  have been going through this, the Boedickers had not
6  returned the trial modification or made the payments,
7  correct?
8    A.  Correct.
9    Q.  As of November 1?
10   A.  Yes.
11   Q.  Had they submitted another loan modification,
12 was there -- would there be any reason why they would
13 not be eligible, if circumstances did -- had changed?
14   A.  No.  They would have still been eligible --
15   Q.  Okay.
16   A.  -- if they had resubmitted.
17   Q.  Okay.  There is no -- there was no investor
18 prohibition that said they couldn't reapply for a period
19 of time?
20   A.  No.
21   Q.  For denying?
22   A.  No.  They were denied for not returning the
23 documents to accept the trial modification, basically is
24 what we talked about earlier.  And had they returned
25 those documents, we would have been able to review them.

Page 63

1    Q.  Well, as we discussed in Exhibit 4 though, it
2  also stated, they were denied for not -- for and making
3  payment, not making the first payment, correct?  It was
4  not just returning the agreement?
5    A.  Oh, yes.  Absolutely.
6    Q.  Okay.
7         MR. BOMAN:  I'm going to object to the
8  characterization of the letter.
9         MR. FLICK:  No, I understand.
10        MR. BOMAN:  It says and/or, which is not
11 necessarily.
12        MR. FLICK:  Okay.
13   Q.  (BY MR. FLICK)  But there would have been no
14 prohibition on reapplying?
15   A.  No.
16   Q.  If circumstances changed, they may have been
17 eligible.  A fair statement?
18   A.  Yes.
19   Q.  Thank you.  Going back to Exhibit 5.  We're
20 almost done.  It also lists, I believe, on Exhibit 5.  I
21 apologize.  Sorry.  The Exhibit 4, I believe.  And
22 the -- yes, Exhibit 4, going back to home -- page two of
23 Exhibit 4.  It talks about the property value of
24 176,500.  Do you see that?
25   A.  Yes.

Page 64

1    Q.  Okay.  How is evaluation of the property
2  relevant, to DTI?
3    A.  Well, it's -- it's -- it's to determine -- it
4  determines the value of the property.
5    Q.  Sure.
6    A.  In order to do the modification, we have to
7  kind of know where the property stands.
8    Q.  Sure.
9    A.  As to the amount owed.
10   Q.  Sure.
11   A.  It's all included in the evaluation.
12   Q.  Okay.
13        MR. FLICK:  Can we take two minutes?
14        MR. BOMAN:  Yeah.
15        (Break taken from 10:12 a.m. to 10:20 a.m.)
16   Q.  (BY MR. FLICK)  Welcome back.  Are you familiar
17 with the Fair Debt Collection Practices Act?
18   A.  Yes.
19   Q.  Okay.  Sorry.  Having reviewed the complaint,
20 documents, MSP, and everything you reviewed in
21 preparation for this deposition today, would you agree
22 with me that the plaintiffs are consumers as defined by
23 the Fair Debt Collection Practices Act?
24   A.  Yes.
25        MR. BOMAN:  I was going to object, calls

Page 65

1  for a conclusion.
2         MR. FLICK:  Yeah, but that's --
3         MR. BOMAN:  But go ahead.
4         MR. FLICK:  Okay.
5    Q.  (BY MR. FLICK)  I'll take your answer with the
6  objection, that's fine.  What date did Rushmore begin
7  servicing this loan?
8    A.  September of 2014.
9    Q.  Okay.  When Rushmore began servicing this loan,
10 was the loan in default?
11   A.  From my review, it was.
12   Q.  Okay.  And you understand what I mean when I
13 say default, correct?
14   A.  Yes.
15   Q.  As part of your review of this loan in the
16 documents, did you get a chance to review the mortgage?
17   A.  Yes.
18   Q.  In this loan?  Would you agree with me that the
19 mortgage itself is a mortgage to two people and by
20 people, I mean individuals?
21   A.  Yes.
22   Q.  Would you agree with me that the mortgage was
23 not a commercial mortgage?
24   A.  No, it's not that.
25   Q.  Okay.  Does Rushmore service commercial loans?

ANTHONY YOUNGER                                    September 27, 2017

Page 66

1    A.  No.  Not to my knowledge.
2    Q.  Okay.  Do you have experience with commercial
3  loans?
4    A.  Oh, yes.
5    Q.  And everything you reviewed, based on your
6  personal experience, would say that this was not a
7  commercial mortgage, correct?
8    A.  Yes.
9    Q.  Okay.  And this mortgage itself was for a
10 residence, or a personal residence, correct?
11   A.  Yes.
12   Q.  Okay.
13        MR. FLICK:  All right.  We're on No. 6.
14        (Exhibit No. 6 was marked.)
15        MR. FLICK:  One for you.
16   Q.  (BY MR. FLICK)  That will be No. 6.  One for
17 you.
18   A.  Okay.
19   Q.  And take a minute and look at that document.
20   A.  Okay.
21   Q.  I will represent to you that the handwritten
22 notes, attention Ryan, and copy of my mortgage plans
23 that keep changing are the handwritings of one of my
24 clients.  I will represent that to you.
25        Other than that, have you seen this

Page 67

1  document before?
2    A.  I have seen a -- a document with this page --
3    Q.  Yes.
4    A.  -- referenced.  There are more pages --
5    Q.  Sure.  There are more pages, correct.
6    A.  -- in -- okay.
7    Q.  We'll agree that this is a multi-page document
8  and this is only one of that document, correct?
9    A.  Yes.
10   Q.  Can you identity this document from Rushmore's
11 perspective, not withstanding my client's handwriting?
12   A.  This -- this document is a portion -- or this
13 are portion of this --
14   Q.  Yeah.
15   A.  -- document is a letter Rushmore sent in order
16 to advise the borrowers of the payment plan that was --
17 or advise them of a plan that -- of action, to help them
18 cure the default.
19   Q.  Okay.
20   A.  And this first page is -- is the opening
21 page --
22   Q.  Sure.
23   A.  -- with the information.
24   Q.  And what's the date of this letter?
25   A.  January 11, 2016.

Page 68

1    Q.  All right.  Let's go to the one, two, three,
2  fourth paragraph that starts with the amount required?
3    A.  Okay.
4    Q.  Reading that first sentence, the amount
5  required to reinstate your loan in full, as of 7392.91,
6  I assume the 732.91 is a typo?
7    A.  That is correct.
8    Q.  Should there been a date there instead?
9    A.  Yes.
10   Q.  Okay.  I'm not going to ask you what that date
11 is.  If you know it, great, but if not, but is 6,686.55,
12 do you see that part?
13   A.  Yes.
14   Q.  Is it fair to say that the 6,686.55 was the
15 restatement amount that Rushmore was soliciting from the
16 Boedickers at that time?
17   A.  On the date of January 11, yes.
18   Q.  Yes.  Okay.  And having reviewed the other
19 records, that was the amount of reinstatement at that
20 time, correct?
21   A.  Correct.
22   Q.  And that would have brought them, if paid,
23 contractually current, correct?
24   A.  To the January payment, yes.
25   Q.  To the January payment.  I apologize.  Now this

Page 69

1  letter itself, this would have been sent out by what
2  department?
3    A.  This would have been the -- a loss mitigation
4  letter that was sent --
5    Q.  Okay.
6    A.  -- to the borrowers.
7    Q.  So the customer correspondence department, loss
8  mitigation department?
9    A.  No.  The loss mitigation is the home retention
10 department.
11   Q.  I'm sorry.  Quote, I --
12   A.  The customer correspondence department would be
13 the --
14   Q.  Okay.  So the home retention department --
15   A.  Right.
16   Q.  -- would have sent this out?
17   A.  Correct.
18   Q.  Again, this letter, as we talked about before,
19 at least two people would have reviewed this letter?
20   A.  Yes.
21   Q.  Before it was sent out?
22   A.  Two people would have reviewed the letter.
23   Q.  All right.  Is it unusual that a letter like
24 this, containing a typo that says 7392.91 would get
25 generated and sent out?

ANTHONY YOUNGER                                   September 27, 2017

Page 70

1    A.  I mean, there -- the -- with this particular
2  letter, per my review, there was a letter that was sent
3  prior to this.  I think it was a day or two before.  So
4  I'm assuming you have that letter also.
5           And the amount and the date was the same.
6  Now being this is just a cover letter for --
7    Q.  Sure.
8    A.  -- that letter.
9    Q.  Sure.
10   A.  There was other information in that letter for
11  a repayment plan that our home retention department was
12  worked on with the borrower.
13   Q.  Okay.  The other letter that you referred to,
14  obviously, none of us have it in front of us today?
15   A.  Uh-huh.
16   Q.  It's your -- based on your review, it was sent
17  out around the same time?
18   A.  It was sent out a few days before.
19   Q.  Okay.  Reinstatement amount listed, the same?
20   A.  Correct.
21   Q.  Okay.  The 6.50 and 6.55, I apologize, the same
22  amounts, correct?
23   A.  Correct.
24   Q.  All right.  It was not asking for another
25  amount?  All right.  The person in the home retention

Page 71

1  department who would have prepared this letter, are
2  they -- they're trained, correct?
3    A.  Yes.
4    Q.  The same policies and procedures, electronic,
5  that we have been talking about before?
6    A.  Yes.
7    Q.  Okay.  Does Rushmore do any sort of internal
8  audit after letters are sent out to say, for example,
9  this letter was sent out and it had this kind of typo on
10  it?
11   A.  We -- we would -- we do an audit, like I said,
12  but that typo --
13   Q.  Okay.
14   A.  -- that number isn't associated with the --
15   Q.  Sure.
16   A.  -- amounts or anything in the account.  It
17  was -- it was just a typo.
18   Q.  Sure.  The audits, how often are they done?
19   A.  They are done pretty regularly.
20   Q.  Do you, yourself, take any part, any part of
21  those audits?
22   A.  No.
23   Q.  Personally?  Okay.
24   A.  No.
25   Q.  So let's say the audit pops up, okay, there is

Page 72

1  a typo on this letter.  Is there a corrective action
2  taken?
3    A.  Yes.  The letter is corrected before it's --
4  it's --
5    Q.  Yeah.
6    A.  -- it's corrected and --
7    Q.  Is a replacement letter sent out to the
8  borrowers?
9    A.  There would be a -- if there was a typo with
10  incorrect information or, as opposed to like the
11  amounts, this just had a -- the date, there is not a
12  date there.
13   Q.  Sure.  But you would agree with me, there's two
14  different amounts there, 7392 and 6866.  You would agree
15  with me on that, correct?
16   A.  There -- there are two different numbers there.
17  I can agree with you there.
18   Q.  Okay.  All right.  The stack of papers is
19  slowly going down.
20        (Exhibit No. 7 was marked.)
21   Q.  (BY MR. FLICK)  I'll show you what we're
22  marking as Exhibit 7.
23        MR. FLICK:  For you.
24        MR. BOMAN:  Okay.
25   Q.  (BY MR. FLICK)  Go ahead and take a look at

Page 73

1  that document.
2    A.  Okay.
3    Q.  Okay.  Have you seen this document before?
4    A.  Yes, I have.
5    Q.  Where did you see this document?
6    A.  I --
7    Q.  I'm sorry.  That's a bad question.
8        MR. BOMAN:  In a room, in Dallas.
9        MR. FLICK:  Yeah, in a room in Dallas.  I
10  understand that.  That's a horrible question.
11   Q.  (BY MR. FLICK)  Can you identity this document?
12   A.  Yeah.  This is a copy of a credit report from
13  Equifax.
14   Q.  Right.
15   A.  Not the entire report --
16   Q.  Right.
17   A.  -- but a portion of the report but...
18   Q.  Correct.  For one of my clients, correct?
19   A.  Yes.
20   Q.  Okay.  Now we're going to just, obviously, look
21  at page two.  Thank you for flipping.  It's pretty easy.
22   A.  Uh-huh.
23   Q.  Now the information here, what's the date
24  reported on this document?
25   A.  January 7 of 2016.

ANTHONY YOUNGER                                    September 27, 2017

Page 74

1    Q.  Okay.  What's the amount past due that's
2  reported?
3    A.  $8,444.  I'm sorry.  $8,449.  I'm --
4    Q.  Okay.  Now we just looked at Exhibit 6.  And we
5  agree that as of January 11th the amount to reinstate
6  was 6,686.55, correct?
7    A.  The amount to reinstate the loan to the January
8  payment was $6,686.55, yes.
9    Q.  Okay.  And we're going to agree that this
10  reporting was done four days before, correct?
11    A.  Correct.
12    Q.  So the amounts are different?
13    A.  The amounts are different, yes.
14    Q.  Why?
15    A.  Well, as of the -- date that this credit
16  reporting was done, which was the 7th of 2016, the
17  borrower was due for their January payment, also.
18    Q.  Okay.
19    A.  And the amount to reinstate it to the January
20  payment --
21    Q.  Okay.
22    A.  -- here is $6,686.  So the credit report
23  reflected the amounts, everything that is due on the
24  account including the January payment.  But if you're --
25  because that's the -- that's the status of the account.

Page 75

1      But to reinstate the loan out of the
2  default that it was in, until that -- to that January
3  payment where they would be --
4    Q.  Sure.
5    A.  -- clearly current is $6,686.33.
6    Q.  What was the contractual mortgage payment as of
7  January 1, 2016?
8    A.  I don't remember the amount.  I -- I can't
9  recall the amount that, precisely, we had.
10    Q.  Anything you could look -- sorry.  I was not
11  trying to cut you off.
12    A.  I understand.
13    Q.  Anything you could look at, that may be in your
14  possession or your attorney's possession, that might be
15  able to tell me what the payment was?
16    A.  I don't have any documents, other than the ones
17  you provided.  Do you have a document I can look at?
18    Q.  I do not.
19    A.  Okay.
20      MR. BOMAN:  He doesn't know what I have.
21      MR. FLICK:  I understand that.
22    Q.  (BY MR. FLICK)  Who reports the information on
23  behalf of Rushmore, to the credit reporting agencies?
24  Is there a particular department?
25    A.  Our credit reporting department.

Page 76

1    Q.  Okay.  Is that a completely separate department
2  from home retention?
3    A.  Yes.
4    Q.  And customer correspondence?
5    A.  Yes, it is.
6    Q.  How many employees are in that department --
7  were in that department as of January 2016?
8    A.  Like I stated in my other answers, I wouldn't
9  want to guess or give you inaccurate information.
10    Q.  I assume they're trained?
11    A.  Yes.
12    Q.  Employees in the customer reporting department,
13  similar training, policy and procedure manual, as
14  online, correct?
15    A.  That is correct.
16    Q.  Okay.  When they report, do they have access to
17  every the -- entire file in MSP?
18    A.  They have access to MSP, yes.
19    Q.  Okay.  Do you know what documents they would
20  look at, in order to do the reporting, as far as the
21  reinstatement, like any other portions of the account?
22    A.  Well, they -- their process as to -- they have
23  access to all of the payments and everything due on the
24  account.  So they would determine the credit reporting
25  amounts from that information.

Page 77

1    Q.  You have reviewed the mortgage, correct, as we
2  talked about?
3    A.  Uh-huh.
4    Q.  Contractual due date is what, on the mortgage?
5    A.  January -- the 1st of --
6    Q.  Every month?
7    A.  Every month.
8    Q.  Is there a grace period in the mortgage or the
9  note?
10    A.  Without it in front of me, I'm assuming, most
11  mortgages do.
12    Q.  Okay.
13    A.  But I don't have it, I wouldn't -- I don't --
14    Q.  Okay.  If I represented to you it's 15 days,
15  would you disagree with that statement?
16    A.  No.
17    Q.  Okay.  Why would the January 1st payment be
18  past due as of January 7th then?
19    A.  Because the contractual payment is due on
20  January 1st.
21    Q.  But there is a grace period?
22    A.  Yeah.  There's a grace period but that doesn't
23  negate the fact that it's due January 1st.
24    Q.  Is it Rushmore's policy to report people late
25  on the 7th of the month, when they haven't made their

ANTHONY YOUNGER                                    September 27, 2017

Page 78

1  payment?
2      A.  It's -- it's our duty to report them deemed for
3  the date that their mortgage was due.  So if they were
4  due for January 1st, we would have to -- we would be
5  violating law if we didn't report accurate information.
6          And at that time, January 7th, there was no
7  mortgage payment so they were due for the January 7th
8  mortgage payment.  The grace payment is for -- which is
9  why there is a fee that comes with the grace period, a
10 late charge.  Because the payment is due on this day.
11     Q.  Yeah.
12     A.  Therefore, if we don't receive it until the
13 15th then -- or the -- after the 15th, or whenever it is
14 late.
15     Q.  Correct.
16     A.  There is a late --
17     Q.  If there is a late fee assessed as of the 16th,
18 we are in agreement?
19     A.  Yes.  Right, there is.
20     Q.  Right.
21     A.  It is technically late on the 1st -- after the
22 1st day of the month.
23     Q.  Okay.  But it's not yet past due with an
24 assessed late fee until the 16th?
25     A.  Correct.

Page 79

1      Q.  Would you agree with that?
2      A.  It is not assessed a late fee until after the
3  grace period, or the 15-day grace period, yes.
4      Q.  When this reporting is done, how many people
5  participate to make the reporting?
6      A.  The reporting is done, usually it -- by a
7  person whose job duties is to --
8      Q.  Sure.
9      A.  -- assign the credit, you know, to report to
10 the credit bureau.
11     Q.  Sure.  And the reporting is done
12 electronically, correct?
13     A.  Correct.
14     Q.  Okay.  Is there a supervisor who oversees,
15 checks the work before it is transmitted?
16     A.  There is a supervisor that is over the
17 department.  And like all of our departments --
18     Q.  Sure.
19     A.  -- we have a system to audit, to make sure that
20 information --
21     Q.  Sure.
22     A.  -- transmitted is correct.
23     Q.  Okay.  How often are the audits done for the
24 credit reporting?
25     A.  Well, audits are -- are frequently done in

Page 80

1  every department.
2      Q.  Sure.  Specifically, the credit reporting
3  department, do you know how often the audits are done?
4      A.  Frequently.
5      Q.  Okay.  What is frequently?
6      A.  It's not -- I don't have an exact day.
7      Q.  Okay.
8      A.  But they're done frequently.
9      Q.  Is it fair to say it's done more than once a
10 year?
11     A.  Absolutely.
12     Q.  Fair to say, more than once every six months?
13     A.  Yes.
14     Q.  Okay.  I'm not going to keep going down that
15 line.  All right?
16     A.  Okay.
17     Q.  Frequently is frequently.  If an audit turns up
18 incorrect reporting, does Rushmore self-correct?
19     A.  Yes.
20     Q.  Okay.  Every time?
21     A.  Every time.
22     Q.  Okay.  Did you have an opportunity to review
23 all of the credit reporting notes for this loan?
24     A.  I reviewed the -- the credit reporting
25 information.

Page 81

1      Q.  Okay.  As we sit here today, on behalf of
2  Rushmore, having reviewed those, is it Rushmore's
3  position that everything was accurately reported to the
4  credit reporting agencies?
5      A.  Yes.
6      Q.  Okay.  How does Rushmore define bona fide
7  error, for purposes of the FDCPA?
8          MR. BOMAN:  I'm going to object.  That's a
9  legal question.
10         MR. FLICK:  Okay.
11     Q.  (BY MR. FLICK)  Don't -- feel free to answer
12 it.
13         MR. BOMAN:  That doesn't get you off the
14 hook.
15     A.  Well, I --
16     Q.  Unfortunately, it does not.
17     A.  I was hoping I --
18         MR. BOMAN:  I guess I would also add,
19 that's -- I think it's beyond the scope of the
20 deposition, regardless.  And we didn't assert bona fide
21 error defense in our answers --
22         MR. FLICK:  Okay.  I apologize.  Well, then
23 strike that question.
24         MR. BOMAN:  When I say we, I mean Rushmore.
25         MR. FLICK:  Yes, I understand that.  We're

Page 82

1  in agreement with that.
2              MR. BOMAN:  Okay.
3              MR. FLICK:  Don't -- don't worry about
4  that.
5        Q.  (BY MR. FLICK)  All right.  Anthony, one final
6  question.  Having sat through, reviewed everything, is
7  it your position that Rushmore has done -- made any
8  errors in the servicing of my clients' loan?
9              MR. BOMAN:  I'm going to object to the
10  question.
11             MR. FLICK:  I understand that.
12             MR. BOMAN:  To the form of the question.
13       A.  Per my review?
14       Q.  (BY MR. FLICK)  Yes.
15       A.  I didn't see anything that Rushmore has,
16  outside of the typo on the letter.
17       Q.  Sure.
18       A.  And that sort of thing.  But there was no error
19  in the amounts, as far as servicing the loan for your
20  clients.
21       Q.  In reviewing -- well, strike that.  I said one
22  final question.
23             In reviewing the loan, do you know how many
24  requests for information or notices of error would have
25  been sent to Rushmore since January 1, 2014?

Page 83

1              MR. BOMAN:  You mean, from anybody?
2              MR. FLICK:  Yes.
3        A.  My answer would be the same to questions --
4        Q.  (BY MR. FLICK)  Okay.
5        A.  -- in that similar earlier --
6        Q.  Okay.
7        A.  -- I wouldn't want to give you the incorrect
8  information so I...
9        Q.  Okay.  I'm not -- I will predicate this final
10  question with, I'm not trying to set the trap here.  To
11  the best of your knowledge, every piece of
12  correspondence sent from the Callahan Law Firm was
13  responded to, on behalf of Rushmore, correct?
14       A.  Yes.
15       Q.  Okay.
16             MR. FLICK:  You know what, that's all I
17  have got.
18             MR. BOMAN:  I don't have anything.
19             (Proceedings concluded at 10:40 a.m.)
20
21
22
23
24
25

Page 84

1                    CHANGES AND SIGNATURE
2  WITNESS: ANTHONY YOUNGER
3  DATE: SEPTEMBER 27, 2017
4  U.S. Legal Support Job No.: 611568
5  PAGE LINE      CHANGE              REASON
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25  DATE                ANTHONY YOUNGER

Page 85

1        I, ANTHONY YOUNGER, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4
   _____      _____
5  DATE                ANTHONY YOUNGER
6
7
8
9  _____ No changes made  _____ Amendment sheet(s) attached
10
11  DOUGLAS AND SERENITY BOEDICKER Vs. RUSHMORE LOAN
12  MANAGEMENT SERVICES LLC
13
14  JOB NO.  611568
15
16
17
18
19
20
21
22
23
24
25

ANTHONY YOUNGER                                    September 27, 2017

                                                        Page 86
1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
2                   AT KANSAS CITY, KANSAS
3   DOUGLAS AND SERENITY        )
    BOEDICKER,                   )
4                                )
              Plaintiffs,        ) Case No.
5                                ) 2:16-cv-02798-JTM-TJJ
    VS.                          )
6                                )
    RUSHMORE LOAN MANAGEMENT     )
7   SERVICES LLC,                )
                                 )
8              Defendant.        )
9
10              REPORTER'S CERTIFICATION
         DEPOSITION OF RUSHMORE LOAN SERVICES LLC
11       CORPORATE REPRESENTATIVE ANTHONY YOUNGER
                  SEPTEMBER 27, 2017
12
13      I, Christy Cortopassi, Certified Shorthand Reporter
14  in and for the State of Texas, hereby certify to the
15  following:
16      That the witness, ANTHONY YOUNGER, was duly sworn
17  by the officer and that the transcript of the oral
18  deposition is a true record of the testimony given by
19  the witness;
20      That the deposition transcript was submitted on
21  _____ to the witness or to the attorney
22  for the witness for examination, signature and return to
23  me by _____;
24      That the amount of time used by each party at the
25  deposition is as follows:

                                                        Page 87
1   MR. BRIAN D. FLICK.....01:30
    MR. DAVID L. BOMAN,....00:00
2
3       I further certify that pursuant to FRCP No.
4   30(f)(i) that the signature of the deponent:
5       __X__ was requested by the deponent or a party
6   before the completion of the deposition and that the
7   signature is to be returned within 30 days from date of
8   receipt of the transcript.  If returned, the attached
9   Changes and Signature Page contains any changes and the
10  reasons therefor;
11      _____ was not requested by the deponent or a party
12  before the completion of the deposition.
13      I further certify that I am neither counsel for,
14  related to, nor employed by any of the parties or
15  attorneys in the action in which this proceeding was
16  taken, and further that I am not financially or
17  otherwise interested in the outcome of the action.
18      Certified to by me this 12th of October, 2017.
19
20
21  _____
    Christy Cortopassi, Texas CSR 6222
22  Expiration Date:  12/31/2017
    Firm Registration No. 343
23  U.S. LEGAL SUPPORT, INC.
    100 Premier Place
24  5910 N. Central Expressway
    Dallas, Texas 75206
25  214.741.6001

ANTHONY YOUNGER
September 27, 2017
Index: $1,160..appeared

## Exhibits

**EX 0001 Defendant's 092717**
3:9 13:7,12

**EX 0002 Defendant's 092717**
3:10 16:20 27:1,2,8

**EX 0003 Defendant's 092717**
3:10 26:15,16 27:7 31:24

**EX 0004 Defendant's 092717**
3:11 43:19 63:1,21, 22,23

**EX 0005 Defendant's 092717**
3:11 48:12 63:19,20

**EX 0006 Defendant's 092717**
3:12 66:14 74:4

**EX 0007 Defendant's 092717**
3:12 72:20,22

## $

**$1,160** 41:16
**$2,950** 27:12
**$6,686** 74:22
**$6,686.33** 75:5
**$6,686.55** 74:8
**$8,444** 74:3
**$8,449** 74:3

## 1

**1** 13:5,7,9,10,12 17:5 18:2 19:16 23:11 24:6,8 26:25 49:8,10 62:9 75:7

82:25
**1,160** 41:16
**10:12 a.m** 64:15
**10:20 a.m** 64:15
**10:40** 83:19
**11** 24:15 67:25 68:17
**11th** 74:5
**130** 7:16
**14** 49:10 53:4 54:19 55:8
**14,450.09** 40:12
**14th** 57:21
**15** 27:12 36:25 77:14
**15-day** 79:3
**15th** 78:13
**16th** 78:17,24
**1700** 5:11
**176,500** 63:24
**1st** 41:10 48:21 53:2 56:19 77:5,17, 20,23 78:4,21,22

## 2

**2** 16:19,20,21 27:1, 2,8
**2,950** 31:25 33:5
**2014** 65:8 82:25
**2016** 17:5 18:2 19:17 23:11 24:6,8 26:25 27:13 44:4 45:10,13 49:8,10,11 53:4 54:19 67:25 73:25 74:16 75:7 76:7
**25** 24:7

## 3

**3** 26:15,16,17 27:7 31:24
**3,168.39** 41:11
**30th** 44:4
**320** 45:5
**35** 7:8

## 4

**4** 43:18,19,22 63:1, 21,22,23
**40** 7:8
**42** 24:7,22

## 5

**5** 48:10,12 63:19,20
**5,000** 15:23 16:5,7
**50** 7:5

## 6

**6** 66:13,14,16 74:4
**6,686.55** 68:11, 14 74:6
**6.50** 70:21
**6.55** 70:21
**6866** 72:14

## 7

**7** 72:20,22 73:25
**732.91** 68:6
**7392** 72:14
**7392.91** 68:5 69:24
**7th** 74:16 77:18,25 78:6,7

## A

**a.m.** 83:19
**ability** 39:25
**Absolutely** 9:7 63:5 80:11
**accept** 62:23
**acceptable** 24:7
**accepted** 42:21
**access** 21:21 59:14,17,20 76:16, 18,23
**account** 41:3 59:5 71:16 74:24,25 76:21,24
**accurate** 78:5
**accurately** 81:3
**acknowledge** 23:1
**acknowledged** 56:10,16
**acknowledgement** 35:20
**act** 11:24 12:2 16:13 64:17,23
**action** 44:2 67:17 72:1
**actual** 12:15 35:1
**add** 39:7,8 56:24 81:18
**addition** 11:2 41:5
**address** 12:7,9, 19 54:1,3
**admission** 14:13
**Admissions** 13:20,22
**admit** 14:5
**advise** 67:16,17

## A

**agencies** 75:23 81:4
**Agency** 16:9,11
**agree** 41:9 42:1,9 46:21 64:21 65:18, 22 67:7 72:13,14,17 74:5,9 79:1
**agreement** 25:24 26:23 27:5,7, 10,11,15,17,19,20, 21,25 28:4 30:4 32:9,17 34:24 35:3, 4 36:10,15 41:12,25 42:8 46:1,4 56:19 57:7,14 63:4 78:18 82:1
**agreements** 25:25 43:11
**ahead** 13:13 48:13 65:3 72:25
**alert** 22:23
**America** 6:5,6,16
**amount** 32:4,7 41:9 43:9 64:9 68:2, 4,15,19 70:5,19,25 74:1,5,7,19 75:8,9
**amounts** 70:22 71:16 72:11,14 74:12,13,23 76:25 82:19
**analysis** 47:13, 20,21 48:2,3,4 60:19 61:9
**and/or** 63:10
**answers** 9:21 76:8 81:21
**Anthony** 4:2,19, 20,21,23,24 82:5
**anticipate** 41:4, 8
**apologize** 12:24 13:14 38:5 63:21 68:25 70:21 81:22
**appeared** 54:21, 22

ANTHONY YOUNGER

September 27, 2017
Index: appears..corres

appears 44:16

application
25:3 28:22

applied 23:21
41:2

approval 29:5
59:21

approve 6:14

arrearages
40:12

arrive 32:2

assert 81:20

assessed 78:17,
24 79:2

asset 5:19

assign 79:9

assume 11:14
20:9 30:5 34:6,25
60:9 68:6 76:10

assuming 70:4
77:10

attached 60:19

attachment
61:6

attachments
57:2,12,14 60:17,21

attention 66:22

attorney 48:18,
25

attorney's 75:14

audit 71:8,11,25
79:19 80:17

audits 71:18,21
79:23,25 80:3

avenue 38:21

average 55:10

aware 11:22
15:12 16:16 35:6

**B**

back 8:10 27:1
39:3 59:9 63:19,22
64:16

bad 73:7

ballpark 18:9
43:5

Bank 6:5,6,16

based 14:18,20
15:3 16:2,8 17:6
23:10 24:4,14 31:1
40:23 47:22 54:15
66:5 70:16

basically 50:9
62:23

basis 14:12 54:17

began 65:9

begin 65:6

beginning 22:12

begins 40:18

behalf 4:17 7:12
15:3,14 16:4 19:17
29:12 32:11 39:3
43:3,10,12 49:14,15
50:10 53:15 60:3
75:23 81:1 83:13

big 23:8

bit 36:20 52:12

body 40:11

Boedicker 4:18

Boedicker's
19:19

Boedickers
23:21 26:9 27:11,
21,25 31:24 39:4
40:25 41:4 50:11
62:5 68:16

BOMAN 8:12,15,
18,20,23 9:1,5 13:9
23:25 53:16,19
56:24 57:1,4,10,12
63:7,10 64:14,25
65:3 72:24 73:8

75:20 81:8,13,18,24
82:2,9,12 83:1,18

bona 81:6,20

book 21:20

borrow 40:18

borrower 25:23
29:7 47:23 70:12
74:17

borrower's
40:18 48:17,24

borrowers
38:20 48:4 50:13
67:16 69:6 72:8

boss' 4:24

bottom 26:3
45:20

box 45:23 46:7

break 5:4 9:5
64:15

Brian 4:15

brought 68:22

bureau 79:10

**C**

calculated
24:19 47:20

California 12:8,
14

call 4:21

Callahan 54:19
60:15 83:12

called 10:11
52:24

calls 64:25

capacity 6:19

case 14:20

caveat 56:24

chain 55:25

chance 8:4 11:19
13:15 53:7 65:16

change 22:8 23:9

changed 35:21
62:13 63:16

changing 66:23

characterizatio
n 63:8

charge 78:10

checks 79:15

Cincinnati 4:12

circumstances
62:13 63:16

clarify 20:18

Client 62:1

client's 67:11

clients 60:9,10
66:24 73:18 82:20

clients' 82:8

coded 59:5

Collection
64:17,23

commercial
65:23,25 66:2,7

committed
15:20

company 18:3

complaint 9:20
11:19 64:19

complete 58:6
59:8,18

completed 40:8
56:17

completely 9:4
21:11,16 76:1

compliance
22:2 49:3,22

complied 41:1

compound
24:10

concluded
83:19

conclusion
65:1

confused 42:14

considered
32:6

consult 36:4

consulted 36:5

consumers
60:9 64:22

contents 53:23

contested 7:17

contractual
41:11 42:3,10,12,23
75:6 77:4,19

contractually
68:23

Copies 10:24

copy 10:20 13:6
17:14 39:1,2 53:11
66:22 73:12

corporate 5:13
7:13 9:9 17:25

correct 4:13
5:14,15 9:10 10:14,
16 11:10,17 13:2
14:1,16 16:15 20:22
24:6,16 28:2 31:16,
19,25 32:12,22 33:1
35:22 38:13,14,16
39:3,5 42:9 44:13,
14 46:8 47:8,10
51:20,21 53:4,5
55:6 56:3 60:6,17,
18 62:7,8 63:3
65:13 66:7,10 67:5,
8 68:7,20,21,23
69:17 70:20,22,23
71:2 72:15 73:18
74:6,10,11 76:14,15
77:1 78:15,25
79:12,13,22 83:13

corrected 72:3,6

corrective 72:1

corres 49:3

**corresponden ce** 48:18,24 49:4,6, 12,19,25 50:4,15 51:1,14 53:3 55:23 56:4,8 61:9 69:7,12 76:4 83:12

**count** 55:10

**court** 7:21,22

**cover** 57:6,15 60:14 70:6

**created** 16:13 32:17

**credit** 73:12 74:15,22 75:23,25 76:24 79:9,10,24 80:2,23,24 81:4

**cure** 67:18

**curiosity** 7:24

**current** 5:17 6:20,22 12:6,19 68:23 75:5

**customer** 49:4, 6,11,19,25 50:15 55:22 56:4 69:7,12 76:4,12

**cut** 55:2 75:11

**D**

**Dallas** 5:9,11 73:8,9

**Dann** 4:15

**data** 38:1

**date** 17:4 26:24 44:3 48:20 65:6 67:24 68:8,10,17 70:5 72:11,12 73:23 74:15 77:4 78:3

**dated** 53:4

**dates** 42:17

**David** 8:8

**day** 55:10,15 58:11,16 70:3 78:10,22 80:6

**days** 70:18 74:10 77:14

**Debt** 64:17,23

**debt-to-income** 23:18

**December** 41:10

**decides** 33:6

**decision** 11:19 15:18 20:2

**deem** 50:24

**deemed** 50:16 78:2

**default** 65:10,13 67:18 75:2

**defense** 81:21

**define** 81:6

**defined** 64:22

**demonstrative** 23:5

**denial** 14:22 15:5 17:2 19:19 23:13,14 24:15 47:9 60:2

**denied** 14:11,12 23:17,23 38:15 45:9 46:2,10 47:2 62:22 63:2

**deny** 29:11

**denying** 62:21

**department** 17:15,19,23 18:2,4, 7,8,16 22:1,2 26:5 28:6,9,11,12,15 33:15 35:12 44:11 49:3,5,6,12,20,23, 25 50:15,24 51:1,2 52:21 55:7,20,23 56:4 57:22 69:2,7,8, 10,12,14 70:11 71:1 75:24,25 76:1,6,7, 12 79:17 80:1,3

**departments** 22:3 26:8 79:17

**depend** 8:12

**depending** 32:4

**depends** 23:8

**deposed** 5:1 7:3, 7

**deposition** 4:10,25 8:5 9:14 64:21 81:20

**depositions** 6:13

**description** 24:2

**determination** 32:3 50:18

**determine** 64:3 76:24

**determines** 64:4

**digits** 44:22,24

**directly** 25:7 39:14 40:17

**disagree** 77:15

**discussed** 60:14 62:4 63:1

**discussing** 51:15

**disjointed** 17:15

**DNA** 10:19,20 11:3 20:20,22 21:3

**doc** 28:24

**document** 10:19,20 11:4,5,6,9 13:13,16,18 14:4 16:24 17:1,4,7,10, 19,21 18:24,25 19:8,11 26:20,22 27:16 28:24 29:19, 23,25 30:19,20 31:1,3,8,10 40:10 43:25 44:5,7,8 48:16 66:19 67:1,2, 7,8,10,12,15 73:1,3, 5,11,24 75:17

**documentation** 60:15

**documents** 6:13 9:16,25 10:3,6, 21,22,24 13:23 14:19 20:20,22 39:1 46:9,20 47:1 53:6 60:3,11,13,20 62:23,25 64:20 65:16 75:16 76:16 19

**Douglas** 4:17

**Drive** 12:14

**DTI** 24:4,7,16,19 47:10 64:2

**due** 32:4 41:10 42:4,10 74:1,17,23 76:23 77:4,18,19,23 78:3,4,7,10,23

**duly** 4:3

**duties** 79:7

**duty** 78:2

**E**

**e-mail** 22:17 35:15

**earlier** 14:15 18:20 20:19 28:20 31:3 37:2,15 38:19 43:16 47:10,11,22 48:23 52:12 54:7 62:24 83:5

**Early** 27:15

**easy** 73:21

**electronic** 10:8 21:16 71:4

**electronically** 23:2 34:3 51:7,11, 17 52:13 79:12

**eligible** 62:13,14 63:17

**employed** 12:20 25:9

**employee** 22:24 30:22 31:16 33:24 52:10,23 58:10

**employees** 17:22 18:9 19:18 21:21 22:15 35:11 58:16 76:6,12

**enclosed** 60:12

**encompasses** 37:8

**end** 50:1

**entire** 10:13 27:24 73:15 76:17

**Equifax** 73:13

**error** 9:23 12:6 49:21 50:6 54:12, 13,18 58:11,18 81:7,21 82:18,24

**errors** 54:23 82:8

**Estate** 11:23 12:1

**estimate** 18:12 43:9 55:13,14

**evaluation** 64:1, 11

**exact** 80:6

**EXAMINATION** 4:4

**exception** 15:13,19 35:25 36:8 37:9

**exceptions** 36:2 37:6,11

**executed** 46:4

**exhibit** 13:7,12 16:20 25:13 26:15, 16 27:1,2,7,8 31:24 43:19 48:12 60:8 63:1,19,20,21,22,23 66:14 72:20,22 74:4

**exhibits** 9:22

**experience** 66:2,6

**explain** 36:19

**explicit** 42:2

**explored** 36:11 38:21

ANTHONY YOUNGER

September 27, 2017
Index: extrapolate..investor

**extrapolate**
36:20

**F**

**fact** 15:4 77:23

**facts** 18:14,22
43:7 49:18 55:16

**factual** 54:16

**failing** 46:3

**fair** 13:21 17:18
19:7 20:3 21:10
28:20 30:5 32:14
34:23 40:15 51:3
57:16 63:17 64:17,
23 68:14 80:9,12

**familiar** 11:23
12:1 14:15 22:25
53:23 64:16

**familiarity**
14:18,19 15:11

**fashion** 6:25

**fast** 5:3

**FDCPA** 81:7

**federal** 7:20
16:14

**federally-
related** 14:6,23

**fee** 78:9,17,24 79:2

**feel** 81:11

**fees** 6:14

**fell** 61:18

**fide** 81:6,20

**field** 5:18

**figure** 32:2 33:6,7

**figures** 29:6

**file** 6:14,22 27:24
32:5 76:17

**files** 6:12,21 7:18,
25

**final** 82:5,22 83:9

**Finance** 16:9,11

**fine** 4:23 39:10
65:6

**Firm** 4:15 60:15
83:12

**Flick** 4:5,15 8:8,
14,16,19,22,25 9:3,
7,8 13:5,8,10,11
16:18,21,23 24:3,
13,14 26:14,17
28:10 43:18,20,21
48:9,13 53:18,21
56:25 57:3,5,7,11,
13,15 63:9,12,13
64:13,16 65:2,4,5
66:13,15,16 72:21,
23,25 73:9,11
75:21,22 81:10,11,
22,25 82:3,5,11,14
83:2,4,16

**flipping** 73:21

**follow** 33:9

**foreclosure**
6:12,20

**forget** 4:18

**form** 6:25 23:13
30:5,8,13 53:19
82:12

**forms** 30:10

**forward** 51:24

**forwarded** 50:14
55:22,24

**found** 58:6

**fourth** 17:10 68:2

**free** 81:11

**frequently** 79:25
80:4,5,8,17

**front** 23:11 54:7
70:14 77:10

**full** 68:5

**G**

**gave** 33:18

**general** 29:17
50:4

**generate** 22:5
23:14 30:16 47:12

**generated** 17:21
19:16 21:25 28:24
29:9,18,24,25 30:2
69:25

**give** 13:6 18:14,22
26:17 37:11,22
43:6,21,22 55:16
58:14 76:9 83:7

**giving** 49:17

**good** 4:6,7,9 61:1

**governed** 21:25

**government**
16:14

**grace** 77:8,21,22
78:8,9 79:3

**great** 68:11

**guess** 18:23
49:17 55:13,18
58:12 76:9 81:18

**guide** 39:25

**guideline** 33:14

**guidelines** 33:7,
12,16,22 34:1,2,7,
11,16,17,20,24,25
35:6,11,21,23 36:1
37:5,13,16,21

**H**

**half** 6:7 12:22

**HAMP** 23:13,14,
20,22 24:8 36:22,24
38:13 47:9 60:2

**handed** 13:11

**handle** 6:12,20

**handled** 7:25

**handwriting**
67:11

**handwritings**
66:23

**handwritten**
66:21

**hang** 17:10

**happened** 40:25

**hard** 46:21

**heads** 22:3

**hear** 28:8

**heard** 4:24

**higher** 23:19

**history** 50:11

**home** 17:15,18,22
18:1 26:4 28:11
33:15 35:12 38:2
44:8 45:23 63:22
69:9,14 70:11,25
76:2

**hook** 81:14

**hoping** 81:17

**horrible** 73:10

**Housing** 16:9,11

**hypothetical**
23:25

**I**

**ID** 30:23 31:2
44:24,25 45:2

**identify** 26:22
29:13

**identity** 13:18
17:1 25:21 31:1,18
43:25 44:6 48:16
51:23 67:10 73:11

**immediately**
50:14

**in-depth** 48:2

**inaccurate** 76:9

**included** 10:6
64:11

**including** 74:24

**income** 47:24

**incoming** 51:10
55:15

**incorrect** 72:10
80:18 83:7

**individuals**
65:20

**inform** 29:10

**information**
12:7 19:3,21,25
24:2 29:3,5,9,10
30:14 31:4 34:15
40:3 47:22 48:1,2
49:20 50:6,12 54:22
58:2,5 59:8 61:11,
21,22 67:23 70:10
72:10 73:23 75:22
76:9,25 78:5 79:20
80:25 82:24 83:8

**initial** 40:4

**initially** 39:17

**input** 31:15

**inputted** 19:23
30:16 34:5 38:1

**inputting** 29:2

**instant** 14:6

**inter** 34:13

**interested** 62:2

**internal** 11:3
20:25 21:11 45:1,3
71:7

**Internally** 36:24

**interrogatories**
9:21 13:2,23

**interrupt** 61:7

**intra-office**
10:17 11:3

**investigated**
56:12

**investigation**
56:17 59:2,7,11,18

**investigations**
58:6

**investor** 32:15
33:9 34:20,23 62:17

ANTHONY YOUNGER

investors 34:22

involved 26:8

Irvine 12:14

issues 11:21

**J**

January 67:25
68:17,24,25 73:25
74:5,7,17,19,24
75:2,7 76:7 77:5,17,
18,20,23 78:4,6,7
82:25

job 6:20,22 79:7

judgment 6:15

**K**

kind 20:12 64:7
71:9

knowledge
14:21 15:3 16:8
23:10 24:4,14 32:20
36:7 37:12 38:25
66:1 83:11

**L**

label 16:18

labeled 45:4

Laguna 12:8,14

language 42:2

large 18:3,8

late 77:24 78:10,
14,16,17,21,24 79:2

law 4:15 54:19
60:15 78:5 83:12

laws 22:6

lawyer 10:4

lead 14:21

led 19:19

legal 5:18 81:9

legislature
16:15

letter 17:2 19:17
23:11,12,13,16,18,
23 25:6,18,21,22,25
26:1,2 27:4 29:18
44:24,25 45:2,4,7,8
48:17,20,22 49:1,2
50:10,14,16,19,24,
25 51:2,14 53:1
55:19 56:20 57:4,6,
15,18,20,23 58:3
60:1,14 63:8 67:15,
24 69:1,4,18,19,22,
23 70:2,4,6,8,10,13
71:1,9 72:1,3,7
82:16

letters 9:22 20:12
21:25 25:10 44:17
51:24 53:8,24,25
54:1,12,15,18,20,22
55:9,19 56:5,20
57:21 61:21 71:8

level 52:23

limit 56:9

limited 11:21

lines 34:11

list 37:1

listed 70:19

lists 63:20

litigated 6:12,15,
23

litigation 6:16,21
7:10,18

loan 14:5,6,23
23:17 32:11,21 33:3
35:7,24 36:6,9,14
37:14 38:4,5,18
42:11 44:1,22 45:9
46:2,8,10,19,24
48:3 50:11 61:18
62:2,11 65:7,9,10,
15,18 68:5 74:7
75:1 80:23 82:8,19,
23

loans 15:23 16:5

33:19 43:3 65:25
66:3

located 5:8

log 30:23

log-in 31:2

logged 57:23

long 5:20,22 6:6
12:18

looked 10:7,18
11:18 19:8 74:4

loss 19:13,15,18
21:19 25:2 26:8
28:5,9,10 45:5
52:12 69:3,7,9

lost 12:11

lot 9:25

**M**

made 20:1 35:6
42:22 59:2,9 61:8
62:6 77:25 82:7

mail 50:24 51:2,
10,12,22 52:17
55:7,9,15,20

mailed 25:6 30:21
51:4

mails 60:2

maintain 37:1

maintained
12:18 30:8

major 46:18

majority 7:22

make 27:25 47:7
58:5 79:5,19

makes 50:18

making 41:5,15
42:24 47:1 63:2,3

managers 22:2

manual 20:23
21:24 22:13 76:13

manuals 21:14,
19

mark 26:14 43:18

marked 13:7,12
16:20 25:15 26:16
43:19 46:7 48:12
66:14 72:20

marking 72:22

matter 14:6 35:14

meant 60:10

mediations
6:13

memorandum
11:20

memorize 37:18

memory 15:20

met 4:10

middle 40:11

mind 4:21

minute 16:23
48:14 66:19

minutes 64:13

missed 10:1

mit 45:5

mitigation
19:13,15,18 21:19
25:2 26:9 26:9,9,10
52:12 69:3,8,9

mod 29:11 40:1
41:14 42:17,25
46:5,19 47:4

modi 41:14

modification
23:17,20,22 24:8
25:24 26:13,23
27:5,7,11,17,20,22
28:4,22 29:5 30:4,
20 32:8 36:9,15,16,
22 37:13 38:5,11,
12,13,17,20,24
39:2,11,12,18,20,24
40:4,6,7,24 41:1,6,
23 42:7,19,22,24
43:2,11 44:1 45:9

46:2,11,20,24 47:2,
3,13,14,18,19 48:5
62:2,6,11,23 64:6

modify 48:3

month 77:6,7,25
78:22

monthly 41:11
42:3

months 5:24
12:23,24 15:22
42:4,10 80:12

morning 4:6,7

mortgage 14:5,
6,23 15:23 16:5
40:19 41:11 42:18
65:16,19,22,23
66:7,9,22 75:6 77:1,
4,8 78:3,7,8

mortgages
77:11

MRT 6:9,10

MSP 10:12,13,18
11:2 20:21 30:1,3,8,
13,17,23,25 31:18
34:5 38:1,2 44:6,25
46:8 53:6 59:2
64:20 76:17,18

multi-page 67:7

multiple 57:1,12,
13,14

municipal 16:9,
11,15

**N**

NA 6:5

nationwide
6:17,18,19 7:1,2

nature 56:9

necessarily
29:17 63:11

needed 5:4

negate 77:23

ANTHONY YOUNGER

**nomenclature** 37:1

**nondefault** 40:18

**nonfacts** 58:14

**nonstandard** 38:12

**notate** 31:13

**notated** 56:15

**notation** 30:2 31:7,10 40:12 45:1,3

**notations** 59:5

**note** 60:8 77:9

**noted** 54:21

**notes** 59:1,9 66:22 80:23

**notice** 8:4,10 12:6 44:1 50:5 54:13

**noticed** 26:1

**notices** 9:23 49:20 50:1 54:12,17 58:11,18 59:4 82:24

**notification** 22:17

**notified** 22:15 52:22,23

**notify** 35:11

**November** 48:21 49:8,10 53:2 56:19 62:9

**number** 12:15 15:10 44:22 71:14

**numbered** 14:4

**numbers** 30:16 44:16 72:16

**O**

**object** 53:16 63:7 64:25 81:8 82:9

**objection** 8:9

9:2 23:25 65:6

**October** 41:10

**offer** 29:11 36:22

**offered** 36:10 39:23 43:2,11

**office** 5:8 9:23

**offset** 8:17

**ongoing** 59:7

**online** 76:14

**opened** 50:21

**opening** 67:20

**opportunity** 26:18,19 34:17 43:22 60:16 80:22

**opposed** 54:23 72:10

**option** 37:22 38:18

**options** 36:12 37:13

**order** 29:11 59:17 60:24 64:6 67:15 76:20

**outcome** 20:2

**output** 31:15

**oversees** 79:14

**owed** 64:9

**owner** 32:15,18, 21 33:1

**P**

**package** 45:24

**packet** 19:13,16, 18 26:13 61:1

**pages** 25:18 67:4,5

**paid** 42:11 68:22

**paper** 21:20

**papers** 72:18

**paragraph** 14:4, 8 15:10 24:15 27:16 31:23 40:17,21 42:2 45:20 53:2 60:7,12 62:1 68:2

**part** 13:25 15:13 17:16 21:3 35:17 37:3 39:24 40:7 57:19 59:19 60:11 65:15 68:12 71:20

**participate** 25:1 79:5

**participated** 25:4 28:21

**participates** 59:24

**parties** 25:1,3

**parts** 27:20

**party** 24:23,25 32:12,14 58:9 59:23 60:2

**past** 74:1 77:18 78:23

**pay** 27:12,22 31:24

**paying** 46:4

**payment** 31:24 32:6 41:25 63:3 67:16 68:24,25 74:8,17,20,24 75:3, 6,15 77:17,19 78:1, 7,8,10

**payments** 28:1 40:19,25 41:2,5,6,8, 10,12,13,15,16,22, 25 42:3,6,8,10,12, 17,18,22,23,25 46:4 47:1,7 62:6 76:23

**pen** 44:19

**people** 18:1,6,25 19:2,7 20:4,6 28:21, 23 38:3 49:11,17 52:17,18 57:19 59:3 65:19,20 69:19,22 77:24 79:4

**percent** 24:7,22

**percentage** 32:4 33:6

**percentages** 33:12

**perform** 39:25

**period** 16:6 62:18 77:8,21,22 78:9 79:3

**permanent** 39:12,17,20 47:18

**person** 19:11,12, 22,24 20:1 29:2,3,4, 13,16 33:15 50:23 51:22,23 55:7 57:22 58:1 59:12 70:25 79:7

**personal** 66:6,10

**personally** 14:1 15:14 71:23

**perspective** 67:11

**piece** 83:11

**pieces** 53:3 55:9

**place** 5:11 8:1 52:6 58:1

**Plaintiff's** 13:19

**plaintiffs** 4:17 23:17 46:2,10 64:22

**plan** 40:12 67:16, 17 70:11

**plans** 66:22

**platform** 10:10, 15 11:15,16

**point** 44:19 56:2, 15 62:4

**policies** 9:13 20:11,15 21:13,18 22:5,20,25 23:6 24:15 34:12 35:17 52:2,5,9,12,20 71:4

**policy** 20:23 22:8, 12,16,18 23:8 24:5 35:24 76:13 77:24

**pooling** 34:24 35:1

**pops** 71:25

**portfolio** 33:25

**portion** 67:12,13 73:17

**portions** 76:21

**position** 5:25 81:3 82:7

**possession** 75:14

**Practices** 64:17, 23

**precisely** 75:9

**predicate** 83:9

**prefer** 4:22

**preparation** 64:21

**prepare** 6:13 9:17 10:3 20:12 25:10 48:22 52:20 59:16

**prepared** 9:12 17:7,19 18:25 19:5, 11 21:23 28:3,5 31:1 38:11 44:6,8 49:1 53:1 57:18 71:1

**preparer** 19:3

**prepares** 52:15

**preparing** 14:1 57:20

**presently** 28:17

**pretty** 24:1 45:16, 18 71:19 73:21

**printed** 30:20 31:5,8,11

**prior** 6:3 70:3

**problem** 55:3

**procedure** 20:23 21:13,18,24 22:12 76:13

ANTHONY YOUNGER

September 27, 2017
Index: procedures..Rushmore

**procedures** 9:13 11:24 12:2 20:11,15 22:5,17, 20,25 23:6,11 24:5, 15 35:18 52:3,5,9, 13,20 71:4

**proceed** 46:23

**proceedings** 5:18 83:19

**process** 19:20 39:24 40:8 46:23 47:15,18 57:25 76:22

**Production** 13:23

**program** 10:19 11:3

**programs** 10:18 36:23 38:4

**prohibition** 62:18 63:14

**property** 63:23 64:1,4,7

**Proprietary** 36:25

**provide** 29:16 43:5

**provided** 61:10, 13,19,23 75:17

**purposes** 81:7

**pursuant** 27:10

**put** 8:11 15:25 30:14 31:4

**Q**

**question** 14:10 24:10 27:14 32:9 44:15 53:17,19 73:7,10 81:9,23 82:6,10,12,22 83:10

**questions** 8:13, 21,24 83:3

**quick** 44:15

**quota** 58:15,19

**Quote** 69:11

**R**

**range** 24:7

**ratio** 23:18 47:10

**read** 14:8 40:21 42:1 50:21

**reading** 54:21 68:4

**Real** 11:23 12:1

**reapply** 62:3,18

**reapplying** 63:14

**reason** 46:1,10 47:2 61:10 62:12

**recall** 15:8 54:3 61:2 75:9

**receive** 22:17 78:12

**received** 19:22 50:19,23 51:3 56:16 57:22 58:2 59:4

**recited** 10:3

**record** 8:11

**records** 9:24 10:5,7 36:8,11 68:19

**reference** 42:16 48:18

**referenced** 27:4 67:4

**references** 53:2

**referred** 41:17 70:13

**referring** 10:22 12:3 25:16 41:14 42:3,7

**reflected** 74:23

**region** 7:1

**regular** 40:19 41:22 42:17,18,24

**regularly** 71:19

**reinstate** 68:5 74:5,7,19 75:1

**reinstatement** 68:19 70:19 76:21

**relevant** 64:2

**relied** 60:11

**remember** 4:14 12:13,15 75:8

**repayment** 70:11

**repeat** 5:2 38:6

**rephrase** 14:25 15:1 24:9 38:7

**replacement** 72:7

**report** 73:12,15, 17 74:22 76:16 77:24 78:2,5 79:9

**reported** 73:24 74:2 81:3

**REPORTER** 24:11 28:8 48:11

**reporting** 74:10, 16 75:23,25 76:12, 20,24 79:4,5,6,11, 24 80:2,18,23,24 81:4

**reports** 75:22

**represent** 66:21, 24

**representative** 5:13,18 7:13 9:9 17:25

**represented** 77:14

**representing** 50:13

**request** 12:7 13:19,23 14:13 35:24 44:1 50:6,12 59:6 60:11 61:5,8

**requested** 31:4

**requester** 59:9

**requesting** 55:1,4 58:9

**requests** 13:22 49:20 82:24

**require** 58:15

**required** 27:12, 22 68:2,5

**reserve** 8:18

**residence** 66:10

**RESPA** 12:3,4 14:16,18 15:3,12, 13,16

**responded** 56:12 83:13

**responding** 53:3

**response** 14:10 50:17 56:18,20 59:16

**responses** 13:2, 22 14:1 58:15 59:1

**Restate** 27:14

**restatement** 68:15

**resubmitted** 62:16

**retained** 30:10

**retention** 17:15, 19,22 18:2 26:5 28:11 33:15 35:12 38:3 44:9 45:24 69:9,14 70:11,25 76:2

**return** 25:23 46:4, 12,20 47:7

**returned** 39:4 62:6,24

**returning** 46:25 62:22 63:4

**review** 8:4 10:1 11:19 13:14,15 15:6 17:6 18:25 19:2,12

22:24 24:17,21 25:2 26:8,18,19 28:21 29:6,15,24 34:17 36:11 38:19 39:17 46:19 47:15 49:20 50:1,4 53:6 54:9 55:10 57:20 59:12, 24 61:22 62:25 65:11,15,16 70:2,16 80:22 82:13

**reviewed** 9:16, 20,22,24 10:5,19 11:1,12 13:1 14:19, 20 15:5,13,15,19 16:3 19:6,18,22 20:1,20 23:16 25:18 27:24 34:18 35:23 36:8,9 37:15 38:4 39:1 40:24 44:5,6 46:8,9 53:7,21 54:15,16,20 55:8,20 56:6,16 58:4 61:1 64:19,20 66:5 68:18 69:19,22 77:1 80:24 81:2 82:6

**reviewing** 20:7 46:23 47:18 58:11 59:12 82:21,23

**reviews** 29:4

**revised** 8:10

**room** 36:1 73:8,9

**Rushmore** 5:13, 15,21,23,25 6:3,19, 22 7:13 9:9,23 10:8, 13 11:2 12:18,20 14:12 15:4,14,22,23 16:2,4,8,9,13 17:3, 7,25 18:3 19:1,9,17 20:11 23:12,14 24:17 25:1,4,7,9 26:3 27:22 29:12 30:22,25 31:16,25 32:2,11,25 34:15 35:3,11 36:17 37:1 38:12 39:3,11,16, 21,22 41:4,8 43:3, 10 47:12 48:19,22 49:14,15 50:10,19 51:3,4 52:10 53:3, 15 54:17 55:2,5,15 56:21 57:19 58:15, 20 59:17,19,24

ANTHONY YOUNGER

September 27, 2017
Index: Rushmore's..Trust

60:3,5,15 61:10
65:6,9,25 67:15
68:15 71:7 75:23
80:18 81:2,6,24
82:7,15,25 83:13

**Rushmore's**
9:13,24 10:5,10
12:6 13:2,22 14:10,
21 23:10 36:8 42:3
49:22 67:10 77:24
81:2

**Rushnet** 20:25
21:3,4,8,10 30:9,11

**Ryan** 66:22

___

**S**

**sat** 82:6

**scanned** 51:7,8,
17

**scope** 11:21
81:19

**self-correct**
80:18

**send** 25:10 29:5
50:10 56:18

**sending** 38:23

**sends** 48:1

**sentence** 62:1
68:4

**separate** 11:2
21:7 76:1

**September** 17:5
18:2 19:16 23:11
24:6,8 26:25 27:12
44:4 45:10,13 49:10
53:4 54:19 55:8
57:21 65:8

**sequence** 44:16

**Serenity** 4:18

**service** 15:19
32:5,11,25 33:18
35:4 37:16 65:25

**serviced** 15:23
16:4

**servicer** 39:16

**servicers** 15:12
36:19,21 37:11
58:22

**services** 32:11
33:25 37:16

**servicing** 10:10,
14 11:16 33:19
34:24 35:3,7 36:6
43:3 65:7,9 82:8,19

**set** 14:4 83:10

**Settlement**
11:24 12:2

**show** 72:21

**showed** 59:11
61:22

**side** 44:15

**sign** 25:23

**signed** 39:1,2,4
46:14,20

**similar** 23:23
24:1 35:14 76:13
83:5

**sincerely** 17:12,
15

**sit** 81:1

**slash** 5:18

**slow** 5:3 24:11

**slowly** 72:19

**small** 15:12,18

**software** 10:18
11:15 38:2

**soliciting** 68:15

**sort** 23:4 36:8,17
37:1 45:1 71:7
82:18

**speaking** 54:18

**specialist** 5:19
6:9,11

**specific** 52:17

**specifically**
5:10 17:7 19:15

**September** 17:5
29:1 44:12 54:12
55:20 80:2

**specs** 33:21

**spiel** 4:24

**stack** 72:18

**standard** 23:12,
13 45:8

**stands** 64:7

**stapled** 13:6

**start** 19:25 32:10
33:19 35:7 51:6

**started** 5:21

**starts** 51:2 68:2

**state** 6:17 7:20,22,
23 8:3 16:15 17:18
44:12 50:12,13
54:17

**stated** 13:1 14:15
15:11 18:20 20:19
22:23 25:25 28:20
32:10 33:5 37:2,15
47:22 54:12 63:2
76:8

**statement** 24:6,
16 30:6 63:17 77:15

**states** 14:5 17:12
60:8

**status** 74:25

**step** 19:24 46:18

**storage** 11:8,9

**stored** 51:11,18

**strike** 20:9 32:9
40:16 49:9 51:13
81:23 82:21

**submitted** 19:19
62:11

**summary** 61:13,
20

**supervisor** 19:6
20:7 58:4,5,10
79:14,16

**supervisor's**
59:21

**supervisors**
18:15,20

**support** 14:22

**supports** 15:5

**sworn** 4:3

**system** 10:6,20,
21 11:12,14 20:17,
18,20,21,22,24
21:2,8 31:13 34:5
58:19 59:17,19
79:19

**systems** 11:11
21:7

___

**T**

**talk** 5:3 10:4

**talked** 31:23
35:14 47:10 62:24
69:18 77:2

**talking** 35:9
42:16 52:11 71:5

**talks** 63:23

**technically**
78:21

**tells** 47:23

**ten** 44:22

**tendency** 5:3

**tendered** 39:3

**terms** 27:19
39:12,19 40:9 48:3

**testified** 4:3 7:12
28:19

**testify** 9:12 58:21

**testimony** 7:18

**Texas** 5:9,11

**theses** 39:25

**thing** 82:18

**things** 51:23 52:8

**thinking** 39:8

**third-party** 25:9

**threshold** 23:19
24:22

**Tier** 36:25

**time** 6:14 10:13
13:13 15:21,22,24
16:2,6 17:21 18:10,
18 25:9 28:14 32:8,
17 35:7,9 39:10
43:1,12,13 45:13
50:7 56:9 60:5
62:19 68:16,20
70:17 78:6 80:20,21

**timeframe** 22:10

**times** 7:3,6,8,12,
16 32:24

**title** 5:17,20 6:8
36:17,24

**today** 8:7 9:9,17
23:22 29:13,17
34:17 64:21 70:14
81:1

**top** 44:15,17 54:14
60:7

**topics** 8:15 9:13

**total** 40:12

**totalling** 41:10

**trained** 51:23
52:1,2,9 71:2 76:10

**training** 22:1,18,
19,22 23:4,5 35:15,
19,20 52:24 76:13

**transmitted**
79:15,22

**trap** 83:10

**trial** 25:23 26:23
27:4,7,11,17,19,22
28:3,22 30:4 32:8
36:9,14,16 38:19
39:2,10,23,25 40:23
41:1,5,14,22 42:7,
16,19,21,25 43:11
46:5,20 47:3,4,19
48:5 62:6,23

**trials** 6:13

**Trust** 32:19,21

ANTHONY YOUNGER

September 27, 2017
Index: turn..Younger

**turn** 14:3 17:9
25:12

**turning** 24:3

**turns** 80:17

**type** 59:6

**types** 52:8

**typo** 60:10 68:6
69:24 71:9,12,17
72:1,9 82:16

**U**

**Uh-huh** 17:13
25:14 32:13 45:22
48:11 55:21 58:25
61:25 70:15 73:22
77:3

**unbroken** 55:25

**underlying**
19:13 30:5

**understand** 5:2
8:16 9:3,8 11:15,20
23:22 35:20 58:21
63:9 65:12 73:10
75:12,21 81:25
82:11

**understanding**
40:23

**unique** 30:22

**unusual** 69:23

**update** 22:16,22,
23

**updated** 22:7,13
52:22

**updates** 22:15,
20 23:6 35:10

**user** 30:23

**V**

**VA** 16:10

**valid** 42:17

**vendors** 25:10

**verified** 29:11

**verify** 19:25

**verifying** 40:3

**video** 23:4

**violating** 78:5

**W**

**wait** 8:20

**waterfall** 23:19
47:12,20 60:19
61:4,9,16,18,21

**Wilmington**
32:19,21,25 33:21,
25 35:10 36:4 39:15
43:3,12

**Wilmington's**
33:12,14,18 34:16
35:23 37:12

**withstanding**
67:11

**Wittington** 5:11

**work** 5:15 6:4,14,
16 79:15

**worked** 5:22 6:5
70:12

**working** 6:3
18:1,6 40:5

**works** 33:25

**worry** 82:3

**written** 17:3
21:18,19

**X**

**Xs** 45:24 46:3

**Y**

**year** 7:6,14,15
22:12 80:10

**years** 5:24 6:7
12:22,23,24 15:22

**Younger** 4:2,19,
21